Rebecca J. WEIR, Plaintiff
and Appellee,

v.

H. Patrick WEIR, Defendant
and Appellant.

Civ. No. 10870.

Supreme Court of North Dakota.

Sept. 6, 1985.

Stefanson, Landberg, Plambeck & Geeslin, Moorhead, Mn., for plaintiff and appellee; argued by Randolph E. Stefanson, Moorhead, Mn.

Lanier, Knox & Olson, Fargo, for defendant and appellant; argued by Robert V. Bolinske, Zuger & Bucklin, Bismarck, on behalf of Lanier, Knox & Olson.

ERICKSTAD, Chief Justice.

H. Patrick Weir appeals from a district court judgment dated October 11, 1984, which granted him and Rebecca J. Weir a divorce on the ground of irreconcilable differences, divided their assets and liabilities, placed in the custody of Rebecca their minor child, and ordered Patrick to pay to Rebecca child support and "alimony." Patrick's sole contention on appeal is that the district court's award of alimony to Rebecca, in varying amounts and for a period of twenty years, is clearly erroneous. We affirm in major part, reverse in minor part and remand.

Patrick and Rebecca were married on June 10, 1961. Of four boys born of the marriage only Justin, age 15, is a minor. Patrick was graduated from the University of Notre Dame Law School in 1964, and since 1965 has been engaged in the practice of law in Fargo. Rebecca has not been employed outside the home for any significant period of time after Patrick attended law school. She has a bachelor's degree in university studies and is currently pursuing a master's degree in addiction counseling at North Dakota State University. Both are 44 years of age and are presently in good health.

Patrick and Rebecca began experiencing marital difficulties in the mid-1970's. Patrick testified that Rebecca "is a good and faithful mother to my children and she was a faithful wife to me." He testified that the immediate cause of his separation from the home was that he and Rebecca were

unable to get along and that he was involved with another woman. Rebecca testified that the "separation was brought about because Pat told me he was having an affair with my friend."

They became considerably indebted during their marriage and there was little, if any, property to be divided at the time of the divorce which could produce income to the parties. Rebecca brought the divorce action which was tried to the court. A trial court's findings of fact presumably disclose the underlying basis of the court's determinations. *See, e.g., Tuff v. Tuff*, 333 N.W.2d 421, 424 (N.D.1983). Therefore, it is appropriate that we set forth the following relevant findings of fact made by the trial court:

> "IV.
>
> "The Defendant is an attorney ...; Plaintiff has a bachelor's degree in university studies, and has not been employed outside the home for any significant period since Defendant was in law school.
>
> \*　\*　\*　\*　\*　\*
>
> "IX.
>
> "The parties disagree as to the value of the Defendant's interest in his law firm's building, the Defendant valuing his interest at $20,000.00, and the Plaintiff valuing Defendant's interest at $30,-000.00.
>
> "X.
>
> "The parties disagree as to the value, extent and relevance of Plaintiff's contribution to Defendant's law school education.
>
> "XI.
>
> "The parties disagree as to the value of Defendant's interest in his law firm, the Defendant valuing his interest at $47,500.00, and the Plaintiff valuing his interest at $162,487.00.

> "XII.
>
> "Based only upon the evidence presented, an accurate present valuation of the Defendant's interest in his law firm and its building cannot be made.
>
> "XIII.
>
> "Plaintiff is presently working toward a master's degree in addiction counseling; evidence indicates she will have completed her training by 1986, and may expect an entry level salary of $12,000.00 per year, increasing to $15,000.00 in three years.
>
> "XIV.
>
> "Evidence indicates that Defendant should continue to receive a salary of just under $80,000.00 per year, and, after 1985, once again receive bonuses on the order of $10,000.00 to $20,000.00 per year.
>
> "XV.
>
> "Defendant had been with his law firm for approximately 17½ years at the time the parties separated; it is reasonable to assume that he may very likely remain with the firm until age 65, a total of approximately 40 years.
>
> "XVI.
>
> "It appears that the style of living enjoyed by the parties prior to the trial was financed in significant part by an accumulating debt.
>
> "XVII.
>
> "Evidence indicates that Defendant will not receive a bonus in 1984, and that much of his income will have to be applied to debt reduction in the next five to ten years."

The trial court accepted the parties' agreement dividing the major part of their personal property, and valued and divided the parties' remaining assets and liabilities as follows:

#### To Patrick

| Assets: | |
|---|---|
| Cash | $ 500 |
| Receivables | 5,000 |
| ½ anticipated tax refund | 5,675 |
| Fargo Country Club Stock | 2,800 |
| Life Insurance (cash surrender value) | 1,338 |
| Liabilities: | |
| Dakota Bank note | (64,250) |
| Pension plan loan | (51,500) |
| Note to law firm | (20,000) |
| Accrued interest | ( 7,382) |
| Accounts payable | ( 6,650) |
| Federal and State taxes | ( 4,873) |
| | ($139,341) |

#### To Rebecca

| Assets: | |
|---|---|
| Honda automobile | $ 2,000 |
| GMC van | 8,875 |
| ½ anticipated tax refund | 5,675 |
| Liabilities: | |
| Accounts payable | (1,739) |
| GMC van loan | (3,400) |
| | $11,412 |

The court ordered that the parties' house valued at $106,950 and subject to a mortgage of $102,202 be sold, the proceeds used to pay the mortgage, and any remaining proceeds be paid to Rebecca. Patrick's interest in his law firm, certain pension plans (valued at $129,776 subject to a loan of $51,500), and an office building owned by the law firm were divided between the parties on the basis of a fixed percentage of any future payments actually realized from these assets,[1] as follows:

"Plaintiff's marital interest shall be determined by one-half of the 17½ years the parties lived together as husband and wife while Defendant worked for his law firm, divided by the total number of years benefits were accumulated prior to being paid; the total of all payments to Plaintiff on account of Defendant's pension plans are to be reduced by one-half the present outstanding indebtedness of $51,500.00, provided, however, that no individual installment shall be reduced by more than 20%; ..."

The court ordered that Patrick pay child support of $300 per month, provide medical insurance coverage for Justin, and be responsible for all unreimbursed medical and dental costs for the child until he reaches the age of 18. In addition, he was ordered to maintain certain life insurance policies. Patrick is entitled to claim the child as a dependent for tax purposes.

The court also ordered that Patrick pay to Rebecca

"... as alimony,[2] for the remaining months of 1984 the sum of $1,300.00 per month. Commencing January 1, 1985, Defendant shall pay to Plaintiff the sum of $2,200.00 per month. Commencing January 1, 1987, that sum shall be reduced to $1,800.00 per month, and commencing January 1, 1990, to $1,500.00 per month.

"Defendant shall be responsible for the payment of alimony to Plaintiff as set forth in the preceding paragraph for a period of 20 years, or until Plaintiff shall remarry, if that should occur at an earlier date, or until Plaintiff receives property due her under the payout of

---

1. In his brief to this Court, Patrick asserted that the trial court erred in not placing a present value on Patrick's interest in his law firm, law building, and pension plans. This issue was waived by Patrick at oral argument.

2. This Court has frequently stated that the use of the term "alimony" is ambiguous because the word may denote either spousal support, which is subject to modification upon proof of a material change in circumstances, or property division, which is a final determination. See *Delorey v. Delorey,* 357 N.W.2d 488, 490 (N.D.1984); *Lipp v. Lipp,* 355 N.W.2d 817, 820–21 (N.D. 1984); *Bullock v. Bullock,* 354 N.W.2d 904, 909 (N.D.1984); *Seablom v. Seablom,* 348 N.W.2d 920, 924 (N.D.1984); *Coulter v. Coulter,* 328 N.W.2d 232, 241 (N.D.1982); *Urlaub v. Urlaub,* 325 N.W.2d 234, 238 (N.D.1982); *Rust v. Rust,* 321 N.W.2d 504, 508 (N.D.1982); *Jochim v. Jochim,* 306 N.W.2d 196, 199 n. 5 (N.D.1981).

We have said that whenever the term "alimony" is used it usually means spousal support as opposed to a distribution of property. *Hedin v. Hedin,* 370 N.W.2d 544, 547 (N.D.1985); *Rust v. Rust,* 321 N.W.2d 504, 508 (N.D.1982); *Jochim v. Jochim,* 306 N.W.2d at 199, n. 5. It is apparent from our review of the record that the alimony awarded to Rebecca is a form of spousal support and not a type of property distribution. *See Bullock v. Bullock,* 354 N.W.2d at 909; *Briese v. Briese,* 325 N.W.2d 245, 248 (N.D.1982).

pension or law firm or building interests, if such payout should commence at an earlier date. If payout to Plaintiff of pension or law firm or building interests should commence while alimony is still payable, alimony payments shall continue for 20 years as ordered, but shall be reduced on a pro rata basis by the amount of such payouts. Alimony payments shall terminate upon Plaintiff's death, but any property payouts due Plaintiff at her death shall be payable to her estate."

Patrick contends that the amount and duration of spousal support awarded to Rebecca lacks substantial evidentiary support and was induced by an erroneous view of the law.

■ A trial court's determinations on matters of spousal support are treated as findings of fact which will not be set aside on appeal unless clearly erroneous. *Oviatt v. Oviatt,* 355 N.W.2d 825, 827 (N.D.1984); *Bullock v. Bullock,* 354 N.W.2d 904, 911 (N.D.1984). A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Hedin v. Hedin,* 370 N.W.2d at 547.

Section 14–05–24, N.D.C.C., authorizes the trial court "to make such suitable allowances to the other party for support during life or for a shorter period as to the court may seem just, having regard to the circumstances of the parties respectively."

■ Factors to be considered when determining whether or not an award of spousal support is appropriate include the respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material. *Smith*

*v. Smith,* 326 N.W.2d 697 (N.D.1982); *Mees v. Mees,* 325 N.W.2d 207 (N.D.1982).

■ We have recognized that one of the functions of spousal support is rehabilitation of the party who has been disadvantaged by the divorce. If rehabilitation is not possible, spousal support may be permanent to provide maintenance for the disadvantaged party. *Oviatt v. Oviatt,* 355 N.W.2d at 827; *Bullock v. Bullock,* 354 N.W.2d at 911.

■ The trial court's findings of fact appear to emphasize the significant disparity in earning ability which exists between the parties. Patrick testified that he was earning at the time of trial an annual base salary of $80,000 (or $4,893.28 per month after deductions for state and federal taxes). In addition to his base salary and other benefits, Patrick received an annual bonus in years prior to the divorce, including an award of $30,500 paid in 1982 and $23,380.64 paid in 1983. Patrick received in excess of $107,000 from the law firm in 1983, which amount included a $200 monthly automobile allowance. He received a similar income in both 1981 and 1982. For reasons of health and otherwise, Patrick took leaves of absence with full pay for five months in 1982, and six months during the latter part of 1983. As a result of his absence Patrick was not paid a bonus in 1984, which made it necessary for him to borrow $20,000 from the law firm.

Patrick testified that he has no plans to leave his law firm and in fact desires to stay with the firm until normal retirement. He testified that his doctors have indicated their concern with the stress involved in his life but have not restricted any of his day-to-day activities.

Rebecca, on the other hand, has never entered the labor force in any non-interrupted or career capacity. She is now at an age at which entry into the employment market may prove to be somewhat difficult.

Rebecca testified that the parties agreed, prior to Patrick beginning law school, that all Patrick "would be responsible for is

going to school. . . . I was to take care of everything else." Rebecca was a grade school teacher for about a year while Patrick was in law school but had to terminate her employment when complications arose from her second pregnancy. Rebecca testified that it was agreed after Patrick finished law school that she would "handle everything" to allow Patrick to establish his law practice. Rebecca was active in volunteer activities during the marriage which in 1982 led to her being employed for a three-month period as a consultant for a human services organization, for which she was paid approximately $4,800.

■ Patrick argues that the trial court apparently treated his earning ability and future income as a marital asset subject to distribution. In *Nastrom v. Nastrom*, 262 N.W.2d 487, 493 (N.D.1978) (*Nastrom 1*), we held that a party's potential future earnings are not a property interest subject to an equitable division of property in a divorce action, but are a proper consideration in determining alimony or support.

> " '[P]otential future earnings, be they the result of a skill developed during marriage or otherwise, are much too tenuous to be a property right. It would be unjust to order the distribution of what is, at best, an expectancy, where that order would not be subject to modification should the expectancy fail to materialize. When the nature of the interest is such that the court must maintain its jurisdiction, distribution of the interest must take the form of alimony or support. Earning power (or the value of an entrepreneurial skill) is properly a consideration for the court . . . . Earning power is not, however, property that a court may divide as it would a parcel of land or a collection of household goods.' " *See also Jondahl v. Jondahl,* 344 N.W.2d 63, 70 (N.D.1984).

It is evident from an examination of the record that the trial court did not view Patrick's earning ability as a divisible property right as suggested by Patrick, but rather, properly considered this factor in determining the nature and extent of its award of spousal support.

Patrick further argues that there exists no evidence in the record to support a finding, nor did the trial court specifically find, that Rebecca is incapable of being rehabilitated. He points out that Rebecca will be fully qualified in 1986 to obtain substantial employment as an addiction counselor.

The instant case is comparable on its facts to *Nastrom v. Nastrom* (*Nastrom 3*), 284 N.W.2d 576 (N.D.1979). In *Nastrom 3* the husband, Ned, had earned substantial income in his business while his wife, Sharon, was a homemaker who had worked outside the home on only a few occasions during their twenty-two years of marriage. Sharon acquired in the trial court's property distribution various assets including cash and future payments of cash. She was also awarded alimony in the amount of $1,000 per month until her remarriage or death. After noting that Ned had the greater earning ability and would be better able to support himself in the future, we said:

> "Sharon is young enough to train for a specific occupation or profession, but it is unlikely she will ever have an income comparable to that of her husband.
>
> "The record indicates that during the marriage, the needs of Ned, Sharon, and their three children were satisfied almost entirely from Ned's earnings. His earnings in recent years have also been primarily responsible for the accumulation of the parties' property.
>
> "The difference in earning capacity justifies requiring Ned to pay alimony, and should be taken into consideration in determining the property division." *Id.* at 581–82.

We noted in *Nastrom 3* that although Ned would be better able to support himself in the future, he would also be burdened by a large indebtedness. We also noted that through "careful budgeting," Sharon's station in life could be maintained and her necessities met through her alimony and cash payments. *Id.* at 582.

Another case decided by this Court on comparable facts is *Bullock v. Bullock,* 354 N.W.2d 904 (N.D.1984). In *Bullock* the husband, Gerald, had earned substantial income in the Air Force while the wife, Patricia, had been a homemaker for most of the seventeen-year marriage. Patricia had a bachelor's degree in education and had worked outside the home sporadically during the marriage, but was unemployed at the time of trial. Those assets capable of being divided at the time of divorce were divided equally and included a cash payment to Patricia for her share of the parties' house. Gerald's future retirement pay was divided based upon a fixed percentage of future benefits to be received. Alimony was awarded to Patricia in the amount of $1,200 per month until her death or until she received her share of Gerald's retirement pay, provided that her share of retirement pay equaled the alimony payment. In discussing the propriety of the alimony awarded in *Bullock,* we said:

"Patricia testified that she would have to return to school to obtain an active teaching certificate. The district court took judicial notice of the limited job market for teachers in the area. The court also found that had Patricia not been a military spouse, 'she could have been an *established* teacher.' Based upon the record before us, and in view of the contingency placed upon the award of alimony with respect to retirement pay which Patricia may receive in future years, we cannot conclude that the district court's findings concerning alimony are clearly erroneous. The court could very reasonably have concluded that rehabilitation beyond Patricia's present earning capacity was not likely in the near future. In the meantime, the disparity in the earning abilities of the parties justifies the award of alimony. *See Nastrom v. Nastrom,* 284 N.W.2d 576, 581–82 (N.D.1979)." *Bullock,* 354 N.W.2d at 911. [Emphasis in original.]

■ Although Rebecca's pursuit of a master's degree in addiction counseling may enable her to achieve some measure of self-support, it is unlikely, as was the case in *Nastrom 3* and *Bullock,* that Rebecca can be rehabilitated to the extent that she will attain an earning capacity comparable to that of her husband. Nor do there exist substantial marital assets that are presently divisible which might otherwise provide comparable resources to the parties.

■ After a marriage of substantial duration—twenty-three years—Rebecca is now on her own without the benefit of Patrick's proven earning ability, and without sufficient property and a comparable earning ability sufficient to maintain the standard of living she enjoyed during the marriage. We have recognized that in many cases, when the property is divided between the parties, it is not sufficient to maintain each of the parties at the same standard of living after the dissolution of the marriage as each enjoyed during the marriage. *Svetenko v. Svetenko,* 306 N.W.2d 607, 612 (N.D.1981). The awarding of spousal support in this case is an attempt to provide an equitable *sharing of the overall reduction in the parties' separate standards of living,* and properly recognizes Rebecca's role in contributing to Patrick's earning capacity which was developed and enhanced during the course of the marriage. *See O'Kelly, Three Concepts of Alimony in North Dakota,* 1 U.N.D. Faculty Journal 69 (1982).

In our view, the fact that Rebecca is capable of rehabilitation should not in itself deprive her of reasonable spousal support in light of the fact that she is likely to have a much lower income producing capacity than Patrick, which earning capacity she aided Patrick in obtaining through her contribution as the homemaker.

Patrick's third and perhaps major argument is that the record does not indicate that the trial court considered the probability that he will be unable to pay the monthly spousal support in light of his income, needs, and obligations. This contention may also be stated as one that asserts that the trial court has placed such an impossible burden upon Patrick that he has been deprived of all incentive and has become, as

alleged in oral argument, an "indentured slave."

■ Obviously, an award of spousal support must be considered in light of the supporting spouse's needs and ability to pay support. *Davis v. Davis*, 268 N.W.2d 769, 777 (N.D.1978). *See also Cook v. Cook*, 364 N.W.2d 74, 76 (N.D.1985); *Larson v. Larson*, 234 N.W.2d 861 (N.D.1975); *Hoster v. Hoster*, 216 N.W.2d 698, 702 (N.D.1974). In *Davis* we quoted with approval from *Hoster*, ¶ 2 of the syllabus, which reads:

" '2. In determining the amount a divorced father should pay for support of a minor child and alimony to a former wife, the court must be mindful not only of the needs of the child and of the former wife, but of the divorced father; and while he should support the child and pay alimony as best he can, he should not be burdened to the extent that all incentive is to be destroyed but some balance must be found between the needs of the child, the former wife, and the father's ability to pay.' "

The years 1985 and 1986 will prove to be especially financially difficult for each of the parties. Rebecca will be continuing her college studies. She testified that she will begin an internship in December of 1985, and "will finish up nine months after that." She is to receive spousal support in 1985 and 1986 of $2,200 per month ($26,400 annually) and child support of $300 per month ($3,600 annually). She listed her projected monthly expenses at $3,402.50 ($40,830 annually), which includes college expenses and provides her, as she stated, the "only style of living I have ever known." In all probability, however, Rebecca will have to reduce her expenses in order to accommodate her new life style as a single person and mother.

Spousal support is to decrease in 1987 to $1,800 per month ($21,600 annually) at the time when Rebecca is expected to enter the employment market. Patrick's obligation to pay child support should terminate sometime in 1987 after Justin reaches the age of 18. The ordered reduction in spousal support in 1990 to $1,500 per month ($18,000 annually) relates to the trial court's finding that Rebecca's projected salary as an addiction counselor should increase from $12,000 to $15,000 after three years in that profession. Her possible employment and income therefrom, however, is merely theoretical at this time.

The record indicates that Patrick receives a gross salary of $79,392 which, after deduction for state and federal taxes, leaves him with a net salary of $58,719.36. The evidence supports the trial court's finding that Patrick should receive, after 1985, annual bonuses on the order of $10,000 to $20,000 per year. Although a bonus in 1985 is not a certainty, Patrick testified that any bonus he does receive that year must first be applied to retire the $20,000 note to the law firm. He listed his monthly expenses, making provision for payment of the $64,250 loan to Dakota Bank over a period of ten years, and for payment of interest on the pension plan loan, which we set forth below after revision in light of the trial court's judgment:

| | |
|---|---:|
| Spousal support (1985) | $2,200.00 |
| Child support | 300.00 |
| Dakota Bank loan | 1,048.50 |
| Interest on pension loan | 515.00 |
| Life Insurance | 427.09 |
| Living Expenses | 1,193.57 |
| | $5,684.16 |

These monthly expenses and loan principal and interest payments outlined by Patrick amount to an annual expense of $68,209.92. Patrick has other expenses including obligations for existing accounts payable of $6,650, accrued interest of $7,382, and taxes of $4,873, which might be partially offset by income from his share of the anticipated tax refund ($5,676), cash and receivables ($5,500), and stock ($2,800), which he received as part of the property distribution, leaving an annual deficit for 1985—assuming no bonus is paid to Patrick in 1985 for his use in paying his expenses—of $14,419.56 or a monthly deficit of $1,201.63.

Clearly, Patrick will be in dire straits in 1985 without a bonus or with the bonus

being obligated to be applied to his $20,000 note to the law firm.

Although the trial court did not explain how Patrick could, from his present income, or his foreseeable income, increase his payments to Rebecca, the court must have concluded that Patrick could meet his obligations in 1986 and thereafter with his additional income from his bonus and by extending payments of his obligations over twenty years (1984 to 2004) after which time he would be entitled, if he retired, to approximately 77½ percent of his law firm interests based upon the trial court's formula for distributing those assets. Rebecca's approximate 22½ percent (17½/39 × ½) share of these assets will be reduced by one-half of the present pension plan indebtedness (½ × $51,500 = $25,750). The court may have concluded that the income tax deduction available from the payment of the increased spousal support would stretch Patrick's earnings sufficiently so that he could make the increased payments to Rebecca, while at the time, make reasonable payments on the interest and principal of his debts and have enough funds remaining to pay for his bare necessities.

 No one has arithmetically demonstrated to us, and we have been unable on the record before us to discern on our own, that it is possible for Patrick to make the increased spousal support payments in addition to making reasonable payments on his debts and paying for his own living expenses. Therefore, we are left with a definite and firm conviction that the trial court made a mistake in increasing the spousal support payments to $2,200 per month for 1985 and 1986 and in imposing spousal support payments of $1,800 per month for the years 1987 through 1989. We conclude, however, that the trial court's imposition of $1,500 per month spousal support payments commencing in 1990, and continuing thereafter for a period of 20 years or until Rebecca remarries is not clearly erroneous. Accordingly, we remand with instructions that the trial court amend the judgment to provide for spousal support payments in the amount of $1,300 per month for 1985 and $1,600 per month for 1986 through 1989. Thereafter, the spousal support payments shall decrease to $1,500 per month as provided for in the original judgment.

An award of spousal support is subject to modification upon a showing of a material change in circumstances. *Cook*, 364 N.W.2d at 76.

The judgment is affirmed in part, reversed in part and remanded for further proceedings consistent with this opinion.

GIERKE, MESCHKE, JJ., and PEDERSON, S.J., and GLASER, D.J., concur.

PEDERSON, S.J., and GLASER, D.J., sitting in place of LEVINE and VANDE WALLE, JJ., disqualified.