Pamela Lynn BRANSON, Plaintiff and Appellant,

v.

David Rex BRANSON, Defendant and Appellee.

Civ. No. 11423.

Supreme Court of North Dakota.

Aug. 20, 1987.

Wayne T. Anderson, Fargo, for plaintiff and appellant.

Johnson, Johnson, Stokes, Sandberg & Kragness, Wahpeton, for defendant and appellee; argued by A.W. Stokes.

ERICKSTAD, Chief Justice.

Pamela Lynn Branson appeals from a divorce judgment and from an order denying her motion to amend findings of fact and conclusions of law, or, alternatively, for a new trial. We affirm in part, reverse in part, and remand with directions.

Pamela and David Branson were married in 1976. Two daughters, Rachael and Nikki, were born in 1976 and 1980. The family resided near Fairmount, North Dakota, where they were engaged in farming. The parties separated in December 1985 and Pamela moved to Fargo with the children.

Pamela commenced an action for divorce on December 26, 1985. The judgment, among other things, (1) provides that neither party shall receive spousal support; (2) awards to David property valued at $580,725; (3) awards to Pamela property valued at $2,827.50; (4) orders David to assume the parties' debts of $606,149.22 and to pay guardian ad litem fees; (5) gives custody of the children to David; and (6) does not order Pamela to pay child support, but retains "jurisdiction on this issue so that child support may be ordered at such time as circumstances dictate."

Pamela asserts on appeal that the trial court's findings of fact relating to property division, spousal support, and child custody are clearly erroneous.

A trial court's determinations on child custody, child support, alimony, and property division are treated as findings of fact, which will not be set aside on appeal unless they are clearly erroneous. *Lapp v. Lapp*, 293 N.W.2d 121 (N.D.1980). Findings of fact are presumptively correct. *Alumni Ass'n of Univ. v. Hart Agency, Inc.*, 283 N.W.2d 119 (N.D.1979). The complaining party bears the burden of demonstrating that findings are erroneous, and a finding is clearly erroneous only when the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Byron v. Gerring Industries, Inc.*, 328 N.W.2d 819 (N.D.1982). Simply because we might have viewed the evidence differently does not entitle us to reverse the trial court. *Jochim v. Jochim*, 306 N.W.2d 196 (N.D. 1981). "A choice between two permissible views of the weight of the evidence is not clearly erroneous." *Owan v. Kindel*, 347 N.W.2d 577, 579 (N.D.1984).

Pamela first asserts that the trial court's findings as to property values and property distribution are clearly erroneous. She argues that the trial court should have

made a finding of the parties' net worth before distributing the parties' property. Where there is sufficient evidence to determine the parties' net worth, the court must do so. *Williams v. Williams*, 302 N.W.2d 754 (N.D.1981). Here, while the trial court did not make a specific finding of net worth, it did find that the parties' assets were $583,562.50 and that their debts were $606,149.22. From those findings it is evident that the parties had a net worth of a negative $22,586.72.

■ The trial court valued the parties' machinery and equipment, including a car valued at $1,500, at $63,600. Pamela asserts that the trial court "failed to consider the value placed upon the same equipment in April of 1985 by the PCA/FHA of $103,000." The action was tried in September 1986. By that time, as David testified, the value of farm machinery had fallen because of the farm economy and there were two more years of wear and tear on the machinery and equipment in the crop years of 1985 and 1986. The finding is not clearly erroneous.

Pamela asserts that the trial court's valuation of the parties' farmland at $280,000 was clearly erroneous. That value was within the range of the evidence and we have not been left with a definite and firm conviction that a mistake has been made. The finding is, therefore, not clearly erroneous.

■ Before trial, David received $9,400 in government support payments in 1986. Pamela asserts that the trial court abused its discretion in failing to treat additional anticipated payments as assets. We note that in her motion to amend the findings of fact and to make additional findings, Pamela did not raise this issue. The evidence on this matter was not very satisfactory [1] and we find no abuse of discretion in failing to include speculative future payments in the parties' assets.

■ Pamela argues that the trial court's disparate property division, in which David was awarded assets of $580,725 and ordered to assume the marital debt and Pamela was awarded assets of $2,827.50, is clearly erroneous. David's award of $580,-

1. David testified on this matter as follows:
"Q Are you receiving any payment pursuant to any farm program?
"A The farm program payment I have received, some of it.
"Q Okay, what are you entitled to in total?
"A I don't have it, I don't have the number and I don't believe I can get it, and some of these fields we had to tear up wheat. We dealt in two offices, the ASCS near Wahpeton and also the one in Wheaton, and they have two different policies, even though it's a federal program, and it pertains in my case to the fields that we had to tear up in the spring because they drowned out and put them to beans. This is complicated and I don't understand it. It's all turned around, and those committees have to work on that and they've been working in the Wheaton office on it since the first of July and they don't know how much they're going to pay. It sounds like they're going to call in the ASCS county committee and decide what to do with it, but we haven't heard anything.
"Q What normally would you be entitled to?
"A In Traverse County we may have to pay back some of what we have already, and in Richland County, I don't remember....
"...
"Q Now, you expect to receive additional payments yet this year; don't you?

"A We're hoping to. They've changed the farm program so much that the ASCS committee can't even keep up with it. At one time we weren't supposed to receive our final payment until next July, and what we have now is a 15 percent payment, I believe, the 15th of November, and now they're backing up on that, too, so I don't know if the people at the ASCS office know when it's coming for sure.
"Q Do you think you will get another payment or group of payments totaling somewhere around the total of what you have already received? Is that your hope?
"A I'm hoping I get lot more than that, but we don't know how this thing is going to come out in Wheaton with the county committee. It might be that we have to pay some of them back, and as I recollect, we're supposed to have 60 percent of our payment already. We're supposed to have 60, but we're probably not going to get the other 40 from Wheaton which is—it depends on what the county committee decides down there.
"Q For Richland County, for North Dakota purposes, you hope to get at least as much as you have already gotten?
"A I should have 60 and 40 percent left, from what comes from the Richland County office."

725 in assets is burdened with marital debts of $606,149.22 plus $1,202.80 in guardian ad litem fees, resulting in a net property award to David with a value of a negative $26,627.02. The property valued at $2,827.50 awarded to Pamela is not burdened with marital debt. The disparity in awarding property and debts to David resulting in a negative $26,627.02 and awarding property to Pamela worth $2,827.50 is not clearly erroneous as to Pamela. We have said that substantial inequalities in property divisions must be explainable. *Anderson v. Anderson*, 390 N.W.2d 554 (N.D.1986). The disparate division burdening David with debts in excess of the assets awarded him while awarding Pamela assets not burdened by debts is explainable. Virtually all of the debts ordered assumed by David were farm-related and he was awarded the farmland, machinery and equipment, and he intended to continue farming. Most of the assets awarded him have some potential to generate income with which to extinguish the debts. The car and household goods awarded Pamela have little or no potential for income generation.

Pamela next asserts that the trial court's determination that neither party should receive spousal support from the other is clearly erroneous. We agree.

A trial court's determination on the matter of spousal support is treated as a finding of fact and will not be set aside unless clearly erroneous. *Weir v. Weir*, 374 N.W.2d 858 (N.D.1985); *Oviatt v. Oviatt*, 355 N.W.2d 825 (N.D.1984). One of the functions of spousal support is rehabilitation of the party disadvantaged by the divorce. *Oviatt v. Oviatt, supra.* As we explained in *Delorey v. Delorey*, 357 N.W.2d 488, 490 (N.D.1984):

> "The purpose underlying alimony or spousal support today is rehabilitative, to allow the disadvantaged party time and resources to acquire new skills. It can be for a limited period of time or it can be permanent to provide the traditional

maintenance for a party incapable of rehabilitation."

"Obviously, an award of spousal support must be considered in light of the supporting spouse's needs and ability to pay support." *Weir v. Weir, supra*, 374 N.W.2d at 865. We recently said that "[t]he determinative factor is the sufficiency of income to permit each party to maintain apart the standard of living enjoyed together." *Bagan v. Bagan*, 382 N.W.2d 645, 646 (N.D. 1986). This, we realize, must be tempered by the necessities of reality.[2]

In our view of the evidence, Pamela has clearly demonstrated that she has been disadvantaged by the divorce and that she is in need of rehabilitative spousal support. Her standard of living has been reduced by the divorce. She has received no education beyond high school. She was not employed outside the home during the marriage. Her present earning ability is not great. At the time of trial, she was netting slightly more than $500 per month as a nurse's aide. She received no income-producing assets in the property distribution. She wishes to pursue a degree in nursing. David, on the other hand, apparently has not had his standard of living reduced by the divorce. He has a two-year degree in electrical technology from the school of science at Wahpeton. He has a greater earning ability than Pamela. He received all of the income-producing assets in the property distribution. He is presently farming and intends to continue.

It is also clear that David does not now have sufficient income to be able to pay rehabilitative spousal support. It is possible, however, that his financial situation may improve in the future. This court said in *Becker v. Becker*, 262 N.W.2d 478, 484 (N.D.1978), that "where there was no initial award of alimony to modify and no express reservation of jurisdiction, the trial court lacked jurisdiction to order the payment of alimony." In view of Pamela's demonstrated need for rehabilitative spousal support and the possibility that David may be able

---

**2.** "[I]n many cases, when the property is divided between the parties, it is not sufficient to maintain each of the parties at the same standard of living after the dissolution of the marriage as each enjoyed during the marriage." *Weir v. Weir, supra,* 374 N.W.2d at 864.

to afford such support in the future, we believe that the trial court should have expressly retained jurisdiction to later award such support if circumstances changed. We are left with a definite and firm conviction that a mistake has been made in not awarding spousal support to Pamela without retaining jurisdiction to later award spousal support if Pamela's needs remain and David is later able to afford to pay rehabilitative spousal support.

We note that, as to child support, the trial court included in the judgment the following provision:

"9. That in view of Pamela's present financial situation, the Court shall enter no order at this time requiring her to pay child support to David but shall retain jurisdiction on this issue so that child support may be ordered at such time as circumstances dictate."

Thus, the trial court retained jurisdiction to order Pamela to pay child support if she became able to do so in the future. The trial court should similarly have retained jurisdiction to order David to pay rehabili-

tative spousal support if he became able to do so in the future and Pamela's need therefor remained.

Pamela contends that the trial court's determination to award custody of the children to David is clearly erroneous. She does not challenge any of the findings of fact underlying the court's determination other than the finding that it is in the best interest of the children that custody be placed with David and the trial court's reliance on the evaluations and recommendations of the guardian ad litem and Dr. Ascano.[3]

■ Pamela (1) asserts that she was the primary care giver to the children throughout the marriage; (2) asserts that the trial court failed to consider her testimony that David was unnecessarily harsh and selective in disciplining the children; (3) asserts that Rachael, if given the chance, would testify that she wanted to live with Pamela; (4) notes that both parties love the children and are disposed to providing for the children's needs; and (5) argues that:

**3.** Among the findings of fact underlying the court's custody determination are the following:

"7. David, Pamela and the two children are all in good physical health.

"7.5 Both Pamela and David are fit and proper parents. It is to the best interest of the children, however, that custody be placed with David.

"8. David, Pamela and the two children have all been evaluated by Dr. Ascano, a psychologist. The results of the evaluation indicate that Pamela would not be as good a custodial parent as David.

\* \* \* \* \* \*

"10. When Pamela and David were first married, Pamela assisted David with farm work until the children were born, after which she spent less time assisting David and more time with the children and other household chores. Until the Court order of April 11, 1986, Pamela was primarily responsible for the care of the children.

\* \* \* \* \* \*

"18. Since the children were born they have lived at the farm located near Fairmount, North Dakota and have attended schools in that area. Both grandparents from both sides of the family, as well as many of the other relatives, have a close relationship with Rachael and Nikki.

"19. Rachael and Nikki have pets at the farm. The farm home is modern, clean and spacious. When David is unable to personally

care for them, his mother, who lives nearby, cares for them. Since April 11, 1986 David has been the primary caretaker of the children. The children continue to be enrolled in the same school as they did before their parents separated.

"20. If the children were to be placed with Pamela, they would have to be cared for by unrelated baby sitters or similar caretakers when Pamela was unavailable. They would not be able to have pets and contact with relatives would be less frequent than if they stayed in Fairmount.

"21. The children are adjusting to living with their father in a single parent home. To assist them in the adjustment, David has sought counseling with Dr. Ascano and the children have been meeting with a therapist on a weekly basis. David has assumed financial responsibility for the expenses of the psychologist and the therapist.

"22. Rachael has indicated that she would prefer to live with her mother although her feelings in this respect are not as strong as when she was originally placed with David in April.

"23. Both Dr. Ascano and the guardian ad litem have concluded that it would be in the best interest of the children if they were placed with David."

"The Court, however, relied upon the recommendation of Dr. Ascano and the guardian ad litem. Those recommendations were based largely upon Dr. Ascano's belief that due to Pamela's mistreatment as a child, she should not be custodial parent. Dr. Ascano could not give preciseness to his theory other than to say there was a greater statistical probability that Pamela would be a less desirable parent because of her childhood experiences. Basing a custody decision upon such guesswork is intolerable. The record is replete with evidence showing Pamela's parental stability, including; caring for four foster children as well as her own; educating her children while still pre-schoolers; and being their daily and primary care giver. Under the circumstances and facts of this case the Court's decision relative to custody was clearly erroneous."

Dr. Ascano testified on direct examination, among other things, that:

"The concern that I have as an expert in the area of child abuse and in seeing Mrs. Pam Branson's psychosocial history of child abuse, coupled with her psychological profile, is a concern to me in regards to her parenting skills....

\* \* \* \* \* \*

"Because of some significant history based on this document, based on my interview of Mrs. Pam Branson, I have some concern that her own emotional trauma and victimization could be projected onto the children.

\* \* \* \* \* \*

"Mr. Branson, also with Mrs. Branson, I gave both of them a personality profile. Mr. Branson has a compulsive personality profile disorder, whereby in degree, Mr. Branson is not as severe as Mrs. Branson and he also does not have the psychosocial history of child abuse victimization.

Dr. Ascano testified on cross examination, among other things, as follows:

"Q So in effect what you're recommending here on the basis that there may be, may be some problem, not that there will be, not that you know there is, but that there may be some problem, that this bond between this mother and these children be broken; is that what you're recommending?

"A I believe that based on the data I have there is a statistical probability that there could be.

"Q Okay. So it might be that at some time in the future this woman, Mrs. Branson, might manifest such a problem that might be described in some of your research, that it might make her less of a good parent than her husband?

"A That's correct.

"Q That's the nuts and bolts of what you're saying?

"A In my profession we live with probability, not certainty.

"Q All right, but you understand on the basis of a probability you're going to destroy the bonds that have been built between this mother and these children, those bonds built between a primary care giver and the children?

"A As I have indicated before, I have been asked unfortunately by the Court to make such a recommendation and in this kind of case, somebody will be the custodian and somebody has to be the visiting parent."

Thus Dr. Ascano's recommendation that David have custody of the children was not based only on "statistical probability" or "guesswork." The guardian ad litem testified that her recommendation that David have custody of the children was based partly on Dr. Ascano's findings and partly on her own experience with Pamela and David.

While the trial court relied, at least to some extent, on the recommendations of Dr. Ascano and the guardian ad litem, it is clear that those recommendations were not the only bases of its determination to place custody of the children with David. *See, e.g.,* findings of fact 18, 19, 20, 21, and 22 set out in footnote 3, *supra,* none of which are, or have been asserted to be, clearly erroneous and which are sufficient in themselves to support the trial court's custody determination.

The trial court was faced with a difficult decision on a close question of which parent should have custody of the children.

Our review of the entire evidence has not left us with a definite and firm conviction that a mistake was made in placing custody of the children with David. The trial court's determination is, therefore, not clearly erroneous.

For the reasons stated, the judgment is affirmed in all respects except for the matter of spousal support. The spousal support provision is reversed and remanded to the trial court with directions to modify the judgment to expressly retain jurisdiction to award rehabilitative spousal support to Pamela in the future if she continues to need it and David is able to pay it in the future. Statutory costs on appeal are awarded to Pamela.

VANDE WALLE, GIERKE and MESCHKE, JJ., concur.

LEVINE, Justice, concurring and dissenting.

I concur in the majority's resolution of the issues of property division and spousal support. I dissent from affirming custody in the non-primary caretaker parent.

The majority recognizes that the trial court was faced with a difficult decision on a close question of which parent should have custody of the children. For the reasons stated in my dissent in *Gravning v. Gravning*, 389 N.W.2d 621, 624 (N.D.1986) (Levine, J., dissenting), I believe the primary caretaker rule should be applied to resolve close questions of child custody.

One reason for applying the primary caretaker rule is that it is in the best interest of the child to preserve the bond that develops between the child and the primary caretaker. *See generally* Chambers, *Rethinking the Substantive Rules for Custody Disputes in Divorce*, 83 Mich.L.Rev. 477, 527–38 (1984). This vital bonding is created by the intimate interaction of the primary caretaker with the child. *See Pikula v. Pikula*, 374 N.W.2d 705, 711 (Minn. 1985). *See generally* Chambers, *supra;* Klaff, *The Tender Years Doctrine: A Defense*, 70 Cal.L.Rev. 335, 344–47 (1982). Equally important are the rule's benefits of increasing both predictability of custody decisions and evenhandedness in negotiations. *See Gravning* at 625.

In third-party custody disputes this court has recognized the importance of the bonding that exists between children and their psychological parents and the harm that disrupting such a relationship may cause children. *See Daley v. Gunville*, 348 N.W.2d 441 (N.D.1984); *Mansukhani v. Pailing*, 318 N.W.2d 748 (N.D.1982). So too in custody disputes between two parents, no less than in parent-third-party disputes, there is something unique in the relationship between the primary caretaker and the child worthy of special weight in making decisions about placement. *See* Chambers, *supra* at 537.

The trial court found that both Pamela and David are fit and proper parents. The older child, Rachael, age nine, expressed a preference to live with her mother. I assume that the trial court gave little, if any, credence to Rachael's preference, because she is too young to know what is in her best interest. Accordingly, I would apply the primary caretaker rule to the facts of this case.

The trial court found that Pamela was primarily responsible for the care of the children until the court awarded David temporary custody of the children on April 11, 1986. David's primary caretaking role since April 11, 1986 is not relevant. The determination of which, if either, parent is the primary caretaker is keyed to the time the divorce proceeding was commenced. *See Pikula v. Pikula*, 374 N.W.2d 705, 714 (Minn.1985). The time the divorce proceeding was commenced is that point in time when the family relationships were physically disrupted by events leading to the dissolution of the marriage, *e.g.*, at the time of the parties' separation or the interruption of the functioning full family unit. *Pikula, supra* at 714, n. 3. Because the trial court found that Pamela was the primary caretaker at the time the parties separated and that Pamela is a fit and proper parent, I would apply the primary caretaker rule and reverse the award of custody to David.