Gregg L. McADOO, Plaintiff and Appellee,

v.

Amy L. McADOO, n/k/a Amy L. Dewald, Defendant and Appellant.

Civ. Nos. 920019 and 920139.

Supreme Court of North Dakota.

Nov. 5, 1992.

Karen Wills of Wills & Lill, Grand Forks, for defendant and appellant.

Janet H. Zander of Anseth & Zander, Williston, for plaintiff and appellee.

LEVINE, Justice.

Amy McAdoo appeals from a divorce judgment, challenging the trial court's property division and denial of rehabilitative spousal support. Amy also appeals from a subsequent order denying her motion for a new trial. We have consolidated the appeals and now affirm, as modified and with instructions.

Amy *McAdoo* and Gregg *McAdoo* were married in August 1990. They separated after only ten months of matrimony. No children were born of the marriage, nor was any real property acquired. The bulk of the marital estate consisted of wedding presents and other personalty brought by each into the marriage. At the time of trial, Amy was 22 years old and Gregg was 24.

Following trial, judgment was entered granting Gregg a divorce and dividing the marital property. Gregg and Amy received the automobile each possessed, the personal property each accumulated individually before and after marriage, and the wedding gifts originating from their respective friends and family. Their respective debts were to be paid by the one incurring them. Finally, the trial court denied Amy's request for rehabilitative spousal support, ordering instead that Gregg pay to Amy $2,500.00 "by way of property settlement to assist [Amy] in moving and resettling."

After timely filing a notice of appeal from the divorce judgment, Amy learned she had developed gynecological problems caused by the human papilloma virus (HPV), a sexually transmitted condition. Based upon this newly discovered malady, Amy moved for a new trial pursuant to NDRCivP 59(b)(4), alleging that she contracted HPV from Gregg while they were married, which warranted reconsideration of the issues of property division and spousal support, including payment of past and future medical expenses for treatment of Amy's condition. We temporarily relinquished jurisdiction over Amy's appeal from the divorce judgment so that she could proceed to present to the trial court her motion for a new trial.

The trial court, having considered conflicting evidence on the matter, denied the motion for a new trial, holding that Amy's infection was discoverable before the divorce proceeding, and that Amy's good prognosis militated against any change in the divorce judgment. Amy appealed. We consolidated the appeal from the divorce judgment with the appeal from the denial of the motion for a new trial. We proceed now to examine the alleged errors Amy assigns to the trial court's determination in each proceeding.

## I. NEW TRIAL

Amy argues she met all the requirements for a new trial on the ground of newly discovered evidence, and that the trial court therefore abused its discretion when it denied her motion for a new trial. Amy brought the motion pursuant to Rule 59(b)(4), NDRCivP, which provides:

"(b) Causes for New Trial. The former verdict or other decision may be vacated and a new trial granted on the application of a party aggrieved for any of the following causes materially affecting the substantial rights of the party:

"4. Newly discovered evidence material to the party making the application, which he could not with reasonable diligence have discovered and produced at the trial."

We have specified the requirements that must be met before an NDRCivP 59(b)(4) motion for a new trial will be granted:

"(1) the evidence must have been discovered following trial; (2) the movant must have exercised due diligence in discovering the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material and admissible; and (5) the evidence must be such that a new trial would probably produce a different result." *Keyes v. Amundson*, 391 N.W.2d 602, 605 (N.D. 1986). (Citations omitted.)

Amy asserts the evidence she presented to the trial court satisfied each prong of the *Keyes* test. Amy's affidavit alleged that Gregg told her, before they were married, that he received word from a past sexual partner that that partner had HPV. Amy claimed this information prompted her and Gregg to agree to be tested for the virus; that she tested negative, and that Gregg told her he, too, tested negative. Amy added that subsequent medical checkups revealed no signs of HPV.

Amy said next that she decided, after divorcing Gregg, to be tested again for HPV because of her suspicion provoked by

Gregg's testimony at the divorce hearing. Although this test did not positively identify an HPV infection, it did reveal abnormalities warranting further diagnosis by a gynecologist. After more testing and, eventually, surgical removal of cell tissue then believed to be potentially cancerous, Amy learned she had flat condyloma (genital warts) and mild dysplasia (mild precancerous cells), each caused by the HPV infection. The abnormal tissue and cells removed from Amy's cervix were determined to be benign, and her prognosis was considered "good." Amy's doctor concluded, however, that Amy may possibly develop cancer, noting that four to six of the sixty strains of HPV "are very aggressive and strongly associated with malignant lesions," and that he did not yet know which of the sixty strains Amy had contracted.

Gregg's affidavit directly contradicted Amy's. Gregg denied having HPV and claimed he never told Amy he had sexual intercourse with anyone infected with HPV. Gregg further denied ever having been tested for HPV. Gregg's doctor submitted an affidavit purporting to reduce to simple terms the text of Amy's doctor's affidavit. In that affidavit, Gregg's doctor traced the medical procedures involved in the diagnosis and treatment of Amy's cervical abnormalities. The doctor added that "mild precancerous cells" were surgically removed from the "superficial layers" of Amy's cervix, were not apparently invasive and were benign. He then confirmed that Amy's condition required her "to be followed very closely with Pap smears," and added, in conclusion, that the surgical procedure used to treat Amy was curative ninety percent of the time.

 After considering the evidence, the trial court denied the motion for a new trial. We will reverse that determination only if convinced the trial court abused its discretion, that is, if the facts and circumstances surrounding this case reveal to us that the trial court displayed an unreasonable, arbitrary or unconscionable attitude in denying Amy's request for a new trial. *Keyes*, 391 N.W.2d at 604; *Farmers Elevator Co. of Horace v. Nagel*, 307 N.W.2d 580, 584 (N.D.1981); *Hoge v. Hoge*, 281 N.W.2d 557, 560 (N.D.1979). We are not convinced that the trial court abused its discretion in this case.

A trial court must state concisely "the different grounds on which [its] ruling is based." NDRCivP 59(f). The court need not, however, "address the merits of each ground raised by the party seeking a new trial. To sufficiently comply with Rule 59(f), all that must be provided is a clear statement of the reasons for denying the motion." *Hoge*, 281 N.W.2d at 560.

The trial court provided two reasons for denying Amy's motion. First, the court found that granting an NDRCivP 59(b)(4) motion for a new trial requires that the allegedly newly discovered evidence "not [be] discoverable or known prior to the trial." The court then added that "Amy could have had a thorough medical exam immediately preceding the trial." Second, the court explained that Amy's prognosis was "good," holding that its previous divorce judgment likely would not change if it were reconsidered.

Amy takes issue with these conclusions, arguing that a medical exam before trial would not have revealed the true extent of her problems, and that it is "novel" to require seemingly healthy parties to submit to a thorough physical examination before proceeding with their divorce action. She also asserts that evidence of Gregg's fault, her resultant gynecological problems, and past and future medical expenses "should have produced a different outcome [at the divorce proceedings], despite the trial court's conclusion that it would not."

While we might agree with Amy that the trial court abused its discretion in basing its denial of the motion on the discoverability of Amy's infection, we need not express an opinion on the matter because we are convinced that the trial court did not abuse its discretion in finding that it would not, upon rehearing, alter the divorce judgment.

The trial court emphasized that Amy's good prognosis was the reason its divorce judgment would not change, if reconsidered. We are able to infer from that determination that the trial court, having acted

as the fact finder for both the divorce and motion for a new trial, was persuaded that Gregg's alleged misconduct, if any, as well as the virus' potential economic impact on Amy, were outweighed by Amy's optimistic prognosis; the young age of the parties; the extremely short duration of their marriage; their meager financial circumstances; and the likelihood that Amy, a full scholarship undergraduate student aspiring to become a lawyer, and Gregg, a medical student, would lead long and productive lives after putting their "mistake" behind them and moving forward. Accordingly, we believe the rationale underlying the trial court's determination that the allegedly newly discovered evidence would not produce a different result in a new trial, is not unreasonable, arbitrary or unconscionable. Therefore, the denial of the motion for a new trial was not an abuse of discretion.

We are troubled, however, by the possibility, albeit slight, that Amy could develop cancer from her HPV infection. Amy's doctor diagnosed a mere 4/60 to 6/60 likelihood that the strain of HPV Amy contracted was "strongly associated with malignant lesions." In order to protect her, if she is one of those unfortunate few who develops cancer from HPV, we direct the trial court to retain jurisdiction over spousal support if it determines, upon a hearing if necessary, that Amy contracted HPV from Gregg. *Cf. Branson v. Branson*, 411 N.W.2d 395, 398–99 (N.D.1987) [jurisdiction over rehabilitative spousal support should be retained when one party has demonstrated need and the other party has future ability to pay]. Accordingly, we instruct the trial court to take the measures it deems appropriate to determine whether Amy, in fact, contracted HPV from Gregg, and to enter an order retaining jurisdiction over spousal maintenance, should it find that Gregg transmitted HPV to Amy.

## II. PROPERTY DIVISION

Amy claims the division of marital property is clearly erroneous because the trial court failed to determine the parties' net worth before applying the *Ruff–Fischer* guidelines. We disagree.

■ A trial court's division of marital property is a finding of fact subject to the clearly erroneous standard of Rule 52(a), NDRCivP. *Spooner v. Spooner*, 471 N.W.2d 487, 491 (N.D.1991). Under that standard, we reverse only if there is no evidence to support a finding, or if, upon reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. *Id.*

■ In dividing marital property, the trial court must, in its sound discretion, equitably distribute the parties' assets. *Bader v. Bader*, 448 N.W.2d 187, 189 (N.D. 1989). All property, including separate property, is subject to distribution, depending upon whether an equitable distribution requires it, *Spooner*, 471 N.W.2d at 491, and an equitable distribution of that property can be made only if the trial court first determines the net worth of the parties' assets, and then distributes those assets utilizing the *Ruff–Fischer* guidelines. *Freed v. Freed*, 454 N.W.2d 516, 520 (N.D. 1990).

■ The trial court did not make a specific finding of the net value of the marital estate. It did, however, explicitly note its consideration of both parties' NDROC 8.3 listings. Consequently, we are able to discern by inference that the court determined the parties' net worth. *Pfliger v. Pfliger*, 461 N.W.2d 432 (N.D.1990). Reviewing all the evidence, we are not definitely and firmly convinced that the trial court mistakenly neglected to calculate the net worth of the parties' assets.

■ We also reject Amy's assertion that the property distribution is clearly erroneous due to the trial court's failure to distribute all the parties' property. Amy does not identify the property alleged to have been neglected, except to refer to it as "the property accumulated by the parties during the marriage other than from wedding gifts." Nor does Amy suggest how to achieve an equitable distribution of the unspecified property or why, as Gregg suggests, we should not infer that the $2,500 awarded her was done so to offset Gregg's retention of a few household furnishings

and appliances that were not otherwise distributed by the trial court.

"The party challenging a finding of fact on appeal bears the burden of demonstrating that the finding is clearly erroneous." *Routledge v. Routledge*, 377 N.W.2d 542, 546 (N.D.1985). We believe Amy has fallen short of meeting her burden. We do not have a definite and firm conviction that a mistake has been made.

## III. SPOUSAL SUPPORT

Amy contends that the trial court's denial of her request for rehabilitative spousal support is clearly erroneous. She complains that the court provided no reasons for the denial, and that the court's finding that she was "somewhat disadvantaged" by the divorce should have prompted an award of spousal support. We disagree.

 A trial court's determination on the matter of spousal support, like property division, is a finding of fact subject to the clearly erroneous standard of Rule 52(a), NDRCivP. Accordingly, we reverse only when the entire record leaves us with a definite and firm conviction that a mistake was made. *E.g., Sateren v. Sateren*, 488 N.W.2d 631 (N.D.1992) (Civil No. 910393, filed Aug. 19, 1992). The purpose of rehabilitative spousal support is to provide a spouse, disadvantaged by a divorce, an opportunity to become self-supporting through education or other training. *E.g., Wahlberg v. Wahlberg*, 479 N.W.2d 143, 144–45 (N.D.1992). Rehabilitative maintenance is appropriate only when a spouse demonstrates that he or she has been disadvantaged and is in need of support, *Branson*, 411 N.W.2d at 398, or when such a finding is inferrable from the record. *Wahlberg*, 479 N.W.2d at 145. In determining whether an award of spousal support is appropriate, the trial court must consider the *Ruff–Fischer* guidelines.[1] *Routledge v. Routledge*, 377 N.W.2d 542, 544 (N.D.1985).

Here, contrary to the assertions of Amy, the trial court provided ample reasoning for its denial of spousal support. After considering the purpose of rehabilitative support and the application of the *Ruff–Fischer* guidelines, the court found that the disadvantage Amy suffered, if any, was slight and did not warrant an award of rehabilitative spousal support. In support of that finding, the court pointed out that this was a marriage of short duration between two healthy, young and able persons. As the trial court noted, "both [parties] are extremely capable and intelligent people who can overcome this situation [*i.e.*, divorce] and have long and productive lives."

The court was understandably impressed by Amy's academic acumen, noting that she was very bright and had attended college on a full scholarship. In addition, the court observed that neither party owned income-producing assets and that the financial circumstances of each were bleak. In effect, the trial court determined that the parties left the marriage with what they brought to it—their youth, their vigor, their talents. The trial court obviously relied on Amy's youth and proven talent in the classroom, the short duration of the marriage, and the parties' meager finances, in finding no disadvantage to justify spousal support. Because we are not definitely and firmly convinced that a mistake was made, we conclude that the denial of spousal support was not clearly erroneous.

Accordingly, we affirm the judgment and order of the district court, as modified and with instructions.

ERICKSTAD, C.J., and MESCHKE, JOHNSON and VANDE WALLE, JJ., concur.

---

1. The factors which make up the *Ruff–Fischer* guidelines include:

"[T]he respective ages of the parties, their earning ability, the duration of the marriage and conduct of the parties during the marriage, their station in life, the circumstances and necessities of each, their health and physical condition, their financial circumstances as shown by the property owned at the time, its value at the time, its income-producing capacity, if any, whether accumulated before or after the marriage, and such other matters as may be material." *Weir v. Weir*, 374 N.W.2d 858, 862 (N.D.1985).