Constance Joanne OLSON,
Plaintiff and Appellee,

v.

Gerald Emil OLSON, Defendant
and Appellant.

Civ. No. 880223.

Supreme Court of North Dakota.

July 17, 1989.

As Corrected Oct. 25, 1989.

Keith Jerome Trader, Fargo, for plaintiff and appellee.

John Billy Hansen, by Donald R. Hansen, Fargo, for defendant and appellant.

MESCHKE, Justice.

Gerald Olson appealed from a decree of divorce from Constance Olson. While he addressed many financial facets of the decree, Gerald principally sought coordinated treatment of his state highway patrol retirement fund with her federal social security benefits. We affirm the trial court, confirming that social security should not be considered in dividing marital property.

## FACTS

Gerald, age 48, and Constance, age 49, were divorced in 1988 after 23 years of marriage. They had three children: Carrie, born in 1968; Lisa, born in 1970; and Jason, born in 1973. Throughout the

marriage, Constance worked for optical companies and Gerald worked for the state as a highway patrolman.

Constance was eligible for social security; Gerald was not. In lieu of social security coverage, Gerald and the state contributed larger amounts to his account in a retirement fund.[1] At the divorce, Gerald's retirement account was valued at $40,137.18 before taxes. An expert for Gerald testified that, in his opinion, Constance's social security was presently worth $18,760, assuming that her benefits began at age 65 and that she lived to age 81.

The trial court placed custody of the minor children with Constance and ordered Gerald to pay $400 per month in child support until Jason turns eighteen. Gerald was authorized "to take the federal tax deduction for the minor children." The trial court ordered that "[Constance] as trustee shall hold the remaining certificates of deposit ... presently held in joint tenancy [with her children] for her children's college fund."

No spousal support was awarded. Most of the property was divided equally, with each receiving their separate farm property, Individual Retirement Accounts, and vehicles. The trial court awarded Gerald his highway patrol retirement account as part of his share of marital property, but ruled that "[s]ocial security benefits of either party shall not be considered in this matter."

On appeal, Gerald argued that child support was excessive and that the joint certificates of deposit were marital property, rather than an educational trust for the children. Gerald also argued that the property division was inequitable for several reasons, arguing particularly that his retirement account was improperly included as marital property, that Constance's social security was improperly excluded, and that part of the value of his retirement fund should have been offset by the value of Constance's social security.

## CHILD SUPPORT

■ Gerald argued that $400 per month child support for Jason was excessive because it was higher than the child support guidelines published by the Department of Human Services. In another child support case, we rejected a like argument:

"Burgess [the father] complains that the guidelines were 'ignored' in awarding more than the guidelines suggested without adequate explanation. This argument equates the guidelines to fixed or maximum amounts, rather than the 'suggested minimum contributions' plainly contemplated by the legislature. Administrative discretion has not been substituted for judicial discretion." *Matter of Kary*, 376 N.W.2d 320, 321 (N.D.1985).

In its discretion, a trial court may award child support exceeding published guidelines.[2]

1. NDCC 39–03.1–27(1) states, in part:
   "It is the further intent of the legislative assembly that because of the increase in state contributions to the North Dakota highway patrolmen's retirement system, the members of such system shall not obligate the state to additional payments for federal social security benefits for such members."

2. *Compare* NDCC 14–09–09.7 as amended by section 4 of S.B. 2245, approved April 12, 1989, by the North Dakota Legislative Assembly:
   "14–09–09.7. ~~Scale of suggested minimum contributions~~ Child support guidelines.
   "1. The department of human services shall establish ~~a scale of suggested minimum contributions~~ child support guidelines to assist courts in determining the amount that a parent should be expected to contribute toward the support of the child under this section. The ~~scale~~ guidelines shall:

   "a. Include consideration of gross income.
   "b. Authorize an expense deduction for determining *net income.*
   "c. Designate other available resources to be considered.
   "d. Specify the circumstances which should be considered in reducing support contributions on the basis of hardship.
   "2. The department shall accept and compile pertinent and reliable information from any available source in order to establish ~~a minimum scale of suggested contributions~~ the child support guidelines. Copies of the ~~scale~~ guidelines shall be made available to courts, state's attorneys, and upon request, to any other state or county officer or agency engaged in the administration or enforcement of this chapter.
   "3. ~~The court shall consider the scale of suggested minimum contributions in making a determination of the amount of payment for~~

# 4

■ Child support is a finding of fact subject to review by the clearly-erroneous standard. *Fleck v. Fleck*, 427 N.W.2d 355, 357 (N.D.1988). Since Gerald had a significantly higher monthly income and since Constance had monthly expenses exceeding her salary, the addition of $400 to Constance's monthly income did little more than enable Constance to maintain a comparable standard of living for their child in her separate household. *See Bagan v. Bagan*, 382 N.W.2d 645, 648 (N.D.1986). We conclude that this award was not excessive.

## CHILDREN'S EDUCATIONAL TRUST

■ Constance held three certificates of deposit, each jointly with an individual child: $2,000 with Carrie; $2,600 with Jason; and $3,000 with Lisa. Gerald argued that these were marital property because they had been purchased with money earned by Constance during the marriage and because they were held in her name. Constance argued that she did not consider them her property nor exercise control over them. Indeed, another certificate, which she held jointly with Jason and which she agreed was her money, was set aside to her in the property distribution. The trial court decreed that Constance hold the three certificates in trust as the "children's college fund."

We recently held that a parent's support obligation may extend beyond a child's eighteenth birthday. *Freyer v. Freyer*, 427 N.W.2d 348 (N.D.1988). In *Davis v. Davis*, 268 N.W.2d 769, 777–778 (N.D.1978), overruled on other grounds, *Nelson v. Trinity Medical Center*, 419 N.W.2d 886 (N.D.1988), we upheld a trial court's order requiring a non-custodial father to pay $10,000 per child into a trust for the children's college educations. Not all parents are

able to afford to plan ahead for their children's college educations. Where they have done so, courts should foster it, not frustrate it. Therefore, we conclude that it was not clearly erroneous for the trial court to set aside these certificates as the "children's college fund."

## PROPERTY DIVISION

Gerald complained that the property distribution was unfair because five bank and savings accounts totalling $23,755 were divided equally, thus exploiting those which he considered his separate property (though jointly held with Constance) because they had been accumulated from his farm income and from family gifts. Property worth over $100,000 was set aside to each. Nevertheless, Gerald complained that, not counting her social security, Constance received $6,000 more than he did.

■ The trial court's division of marital property is a matter of fact, reviewed by the clearly erroneous standard. *Branson v. Branson*, 411 N.W.2d 395, 396 (N.D. 1987). The possibility of a different permissible division is not enough to convince us of error. *Id.* Division of marital property need not be exactly equal to be equitable. *Fleck v. Fleck*, 427 N.W.2d 355 (N.D.1988). Neither the source of ownership nor the title to property dictates distribution of an item of property to the spouse who acquired it during the marriage. *Anderson v. Anderson*, 368 N.W.2d 566 (N.D.1985). While inherited property should be set aside to the heir where fairly possible, *Winter v. Winter*, 338 N.W.2d 819 (N.D.1983), calculating its value into the marital equation is often equitable in long-term marriages. *Behm v. Behm*, 427 N.W.2d 332, 337 (N.D.1988). The disparity in the value of property distributed here

child support There is a rebuttable presumption that the amount of child support which would result from the application of the child support guidelines is the correct amount of child support. The presumption may be rebutted if a preponderance of the evidence in a contested matter establishes that factors not considered by the guidelines will result in an undue hardship to the obligor or a child for whom support is sought. A written finding or a specific finding on the record must be made

if the court determines that the presumption has been rebutted.
"4. The department shall review the child support guidelines periodically, as the department determines necessary, but at least once every four years, to ensure that the application of the guidelines results in the determination of appropriate child support award amounts."
(Strike-throughs show deletions and underlining shows additions made by the amendment).

was not so great that the division of all bank accounts equally was inequitable or unexplainable.

## SOCIAL SECURITY

Gerald argued that it was inequitable to exclude Constance's social security from the reckoning of marital assets. Unaided by superficial and unhelpful briefs from both spouses, we must cautiously survey the relationship of the federal social security program to state marital property law. To begin, we examine the structure of the federal social security plan.

Upon satisfying the necessary age requirements, a fully insured social security retiree, a spouse, an ex-spouse who was married to the retiree for at least 10 years, and any dependent children are entitled to federal social security benefits. 42 U.S.C. §§ 402(a) to (f). Benefits are also available to insured workers who become disabled and to their dependents. 42 U.S.C. §§ 402(b) to (d). But "[t]he right to alter, amend, or repeal any provision of this [Social Security Act] is hereby reserved to the Congress." 42 U.S.C. § 1304. Thus, there are both pre-conditions to benefits and uncertainties in benefits.

■ The right of a person to future social security payment is non-transferable and non-assignable. 42 U.S.C. § 407(a). Social security rights are not "subject to execution, levy, attachment, garnishment, or other legal process...." *Id.* In 1975,

this enjoinder from "legal process" was partially lifted for "child support" and "alimony." 42 U.S.C. § 659(a).[3] Then, in 1977, Congress confined the kind of "alimony" for which benefits are reachable by "legal process" to "periodic payments of funds for the support and maintenance of the spouse (or former spouse)" of an insured individual. 42 U.S.C. § 662(c) went on to declare explicitly:

> "Such term [alimony] does not include any payment or transfer of property or its value by an individual to his spouse or former spouse in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses."

Congress prohibited the use of "legal process" to disperse social security for "equitable distribution of property, ... between spouses or former spouses." *Id.* Federal law has carefully limited a divorced spouse's ability to reach expected benefits of the other spouse through legal proceedings.[4]

■ Interpreting this statutory scheme, the United States Supreme Court held that social security benefits were not an "accrued property right." *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960):

> "[E]ach worker's benefits, though flowing from the contributions he made to the national economy while actively em-

3.  42 U.S.C. § 659(a) states, in part:

    "Notwithstanding any other provision of law (including section 407 of this title) effective January 1, 1975, moneys (the entitlement to which is based upon remuneration for employment) due from, or payable by, the United States ... to any individual, including members of the armed services, shall be subject, ... to legal process brought for the enforcement, against such individual of his legal obligations to provide child support or make alimony payments."

4.  The United States Supreme Court has summarized the effect of these restraints:

    "In 1975, Congress amended the Social Security Act to provide that all federal benefits, including those payable to members of the Armed Services, may be subject to legal process to enforce child support or alimony obli-

gations. Pub.L. 93–647, § 101(a), 88 Stat. 2357, 42 U.S.C. § 659. In 1977, however, Congress added a new definitional section (§ 462(c)) providing that the term 'alimony' in § 659(a) 'does not include any payment or transfer of property ... in compliance with any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses.' Pub.L. 95–30, § 501(d), 91 Stat. 159, 42 U.S.C. § 662(c) (1976 ed., Supp. IV). [*See* 1983 ed.] As we noted in *Hisquierdo*, it is 'logical to conclude that Congress, in adopting § 462(c), thought that a family's need for support could justify garnishment, even though it deflected other federal benefits from their intended goals, but that community property claims, which are not based on need, could not do so.' 439 U.S., at 587 [99 S.Ct., at 811]." *McCarty v. McCarty*, 453 U.S. 210, at 230, 101 S.Ct. 2728, at 2740, 69 L.Ed.2d 589 (1981).

ployed, are not dependent on the degree to which he was called upon to support the system by taxation. It is apparent that the noncontractual interest of an employee covered by the Act cannot be soundly analogized to that of the holder of an annuity, whose right to benefits is bottomed on his contractual premium payments." *Id.*, at 609–10, 80 S.Ct. at 1371–72.

The "noncontractual interest" in social security does not vest a property right.

"To engraft upon the Social Security system a concept of 'accrued property rights' would deprive it of the flexibility and boldness in adjustment to ever-changing conditions which it demands." *Flemming*, at 610, 80 S.Ct. at 1372. This difference from private pension plans has been described:

> "Congress, which has recognized the need for vested pension rights in the private sector, has, in the intervening 26 years since *Flemming*, retained section 1304 of the Social Security Act. This inaction, in the face of legal trends toward vested rights, only serves to confirm the court's view that the social security system is essentially different from other benefit and insurance programs and still needs the flexibility provided by section 1304." *In re Marriage of Nizenkoff*, 65 Cal.App.3d 136, at 139–40, 135 Cal.Rptr. 189, at 191 (1976). (Footnotes omitted).

Social security benefits are not treated as property.

*Flemming v. Nestor, supra,* also demonstrates how social security benefits can be changed or repudiated. It held that Congress could cut off benefits being paid to deported resident aliens, saying that Congress can constitutionally terminate benefits under its retained powers. "[T]he mere denial of a noncontractual government benefit" does not violate due process or constitute an ex post facto punishment. *Id.*, 363 U.S., at 617, 80 S.Ct. at 1376. Social security benefits are not fixed.

Congressional power to change social security benefits was again affirmed when the United States Supreme Court upheld offsetting state worker's compensation benefits from social security benefits under 42 U.S.C. § 424a. *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971). *Richardson* reiterated "the power of Congress to make substantial changes in the laws of entitlement to public benefits:"

> "The fact that social security benefits are financed in part by taxes on an employee's wages does not in itself limit the power of Congress to fix the levels of benefits under the Act or the conditions upon which they may be paid. Nor does an expectation of public benefits confer a contractual right to receive the expected amounts." 404 U.S., at 80, 92 S.Ct. at 257.

This retained power to alter, amend, or repeal benefits makes it awkward for the courts to count benefits as assets of definable value.

It may be unlikely that Congress will repeal the Social Security Act in the foreseeable future and an individual's interests are substantial enough to be protected from arbitrary government action by the Due Process Clause. *Flemming, supra,* 363 U.S., at 611, 80 S.Ct. at 1372. Still, Congress may significantly alter benefits before Constance begins to receive them. Furthermore, if Constance dies before qualifying for benefits, her survivors will get virtually nothing and the "present value" of social security posited by Gerald's expert will have been illusory. Therefore, Constance's social security expectancies cannot be equated to vested property rights in a private retirement fund.

Social security is similar to other federal retirement plans. Therefore, United States Supreme Court decisions about other federal retirement programs are also instructive.

Railroad retirement is one federal program. Angela Hisquierdo sought part of Jess Hisquierdo's railroad pension under California's community-property law. The Supreme Court of California held that the pension was divisible community property because benefits flowed from employment during the marriage. The U.S. Supreme Court reversed. *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). "California must defer to the fed-

eral statutory scheme for allocating Railroad Retirement Act benefits insofar as the terms of federal law require." *Id.*, at 582, 99 S.Ct., at 808.

■ Federal Railroad Retirement benefits are funded by a federal tax paid by employees and carriers. Benefits are dispensed in two tiers: "The upper tier, like a private pension, is tied to earnings and career service.... The lower, and larger, tier of benefits corresponds exactly to those an employee would expect to receive were he covered by the Social Security Act." *Id.*, at 574–75, 99 S.Ct. at 804–05. Like social security, railroad retirement benefits may be changed by Congress at any time. *Id.*, at 575, 99 S.Ct., at 805. The Court ruled that a spouse's entitlement to share the pension ended with divorce. *Id.*, at 584–85, 99 S.Ct., at 809–810. When the railroad retirement act was revised in 1974, Congress rejected a proposal to award a divorced spouse a direct benefit like that available under the Social Security Act. *Id.*, at 585, 99 S.Ct., at 810. Therefore, offsetting benefits against other marital property would also conflict with the federal plan and injure its objectives which the Supremacy Clause forbids. *Id.*, at 589, 99 S.Ct., at 812.

The United States Supreme Court concluded that division of railroad retirement benefits in divorce was prohibited by 45 U.S.C. § 231m which protected benefits from legal process and exempted benefits from taxation, garnishment, and attachment. *Hisquierdo*, at 584, 99 S.Ct., at 809. In 1983, after *Hisquierdo*, Congress helped divorcing spouses by amending 45 U.S.C. § 231m to permit distribution of upper tier benefits in divorce.[5] Since then, we have recognized that the lower tier was analogous to social security, and we have ruled that it still could not be considered, distributed, or offset in marital property divisions. *Belt v. Belt*, 398 N.W.2d 737 (N.D. 1987). *Belt* foreshadowed this analysis of the relationship of federal social security to state marital property laws.

■ In *Belt*, the trial court properly divided Robert Belt's upper tier benefits under the permissive amendment to 45 U.S.C. § 231m(b)(2), but awarded the equity in the house to Barbara Belt because Robert would receive a " 'substancial [sic] share of his retirement credits.' " *Belt*, at 739. We held that the trial court improperly included lower tier benefits in Robert's share of retirement benefits and we concluded this was "an 'offset' prohibited by the Supreme Court's interpretation of § 231m enunciated in *Hisquierdo*." *Id.* We followed both the rationale and the holding of *Hisquierdo* in concluding that the federal railroad retirement program prohibited the consideration of that portion of its benefits equivalent to social security in dividing marital property. *Hisquierdo* and *Belt* instruct us that social security is not subject to adjustment by state courts, even indirectly by offset.

Military retirement is another federal program. Richard and Patricia McCarty had been married for all of Richard's military career until they were divorced two years before his 20th year when he became eligible for retirement with pay. A California trial court held that the pension was community property and divided it. The California Court of Appeals affirmed. The United States Supreme Court reversed and remanded, ruling that state divorce law conflicted with the federal plan for distributing military retirement benefits. *McCarty v. McCarty*, 453 U.S. 210, 101 S.Ct. 2728, 69 L.Ed.2d 589 (1981).

■ The Court acknowledged that some federal benefits can be treated as community property:

"[T]he Civil Service amendments require the United States to recognize the community property division of Civil Service retirement benefits by a state court, while the Foreign Service amendments

---

5. 45 U.S.C. § 231m(b)(2) now states:

"This section shall not operate to prohibit the characterization or treatment of that portion of an annuity under this subchapter ... as community property for the purposes of, or property subject to, distribution in accordance with a court decree of divorce, annulment, or legal separation or the terms of any court-approved property settlement incident to any such court decree...."

establish a limited federal community property concept." *Id.*, at 231, 101 S.Ct., at 2740.

The Court rejected similar treatment for military benefits because Congress had not expressly permitted consideration of them in marital property settlements. The Court ruled that military retirement was a "personal entitlement" which ceases at death unless the beneficiary voluntarily reduces the pension in order to establish an annuity for survivors. *Id.*, at 224–226, 101 S.Ct., at 2737–2738. A military pension cannot be attached except, like all federal retirement benefits, for support payments. *Id.*, at 230, 101 S.Ct., at 2739. In these respects, *McCarty* followed *Hisquierdo:*

"But *Hisquierdo* did not hold that only the particular statutory terms there considered would justify a finding of preemption; rather, it held that '[t]he pertinent questions are whether the right as asserted conflicts with the express terms of federal law and whether its consequences sufficiently injure the objectives of the federal program to require nonrecognition.' [*Hisquierdo,* 439 U.S., at 583, 99 S.Ct., at 809.]." *McCarty,* 453 U.S., at 220–21, 101 S.Ct., at 2735–36.

So, *McCarty*, too, tells us that we must avoid conflict between state divorce law and federal social security.

After *McCarty*, this court deferred to the exclusive federal treatment of military retirement benefits. In *Webber v. Webber,* 308 N.W.2d 548, 549 (N.D.1981), we concluded that trial courts could not use military retirement in dividing marital proper-

ty. In *Rust v. Rust,* 321 N.W.2d 504 (N.D. 1982), we reiterated that view although we recognized that military retirement could be used for spousal support. In 1982, in response to *McCarty*, Congress enacted the Uniformed Services Former Spouses' Protection Act (USFSPA) to permit a state court to treat military retirement pay as individual or joint property according to state law. 10 U.S.C. § 1408.[6] After this change, we again considered military retirement in marital property distributions. In *Bullock v. Bullock,* 354 N.W.2d 904 (N.D.1984), we ruled that a pension was a divisible asset under USFSPA, which overruled *McCarty*. In *Delorey v. Delorey,* 357 N.W.2d 488, 491 (N.D.1984), we summarized that *Bullock* "concluded that a non-vested military pension was properly considered an asset for purposes of property distribution...." *See also Watne v. Watne,* 391 N.W.2d 636 (N.D.1986). This history cautions us to avoid state court interference with federal social security unless expressly authorized.[7]

■■■■ Courts in other states have recognized this need for deference to the federal social security plan. For the most part, decisions in other states have held that social security is a federal program beyond state control in divorce decrees.

In 1976, even before *Hisquierdo* and *McCarty*, a California Court of Appeals did so. *In re Marriage of Nizenkoff,* 65 Cal. App.3d 136, 135 Cal.Rptr. 189 (1976). The court reasoned that 42 U.S.C. § 1304, which permits Congress to alter, amend, or

---

**6.** 10 U.S.C. § 1408(c)(1) states:

"Subject to the limitations of this section, a court may treat disposable retired or retainer pay payable to a member for pay periods beginning after June 25, 1981, either as property solely of the member or as property of the member and his spouse in accordance with the law of the jurisdiction of such court."

10 U.S.C. § 1408(d)(5) states:

"If a court order described in paragraph (1) provides for a division of property (including a division of community property) in addition to an amount of disposable retired or retainer pay, the Secretary concerned shall, subject to the limitations of this section, pay to the spouse or former spouse of the member, from the disposable retired or retainer pay of the

member, any part of the amount payable to the spouse or former spouse under the division of property upon effective service of a final court order of garnishment of such amount from such retired or retainer pay." No comparable provisions are found in the Social Security Act.

**7.** Very recently, this caution was repeated by the United States Supreme Court. *Mansell v. Mansell,* —— U.S. ——, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989). Interpreting disputed provisions in USFSPA, enacted in response to *McCarty*, the Court ruled that state courts may not treat, as property divisible upon divorce, that part of military pay waived by a retiree in order to receive veterans' benefits. Congress had not clearly authorized it.

repeal the Social Security Act, indicated that Congress intended to keep social security under federal control. The court relied on *Flemming v. Nestor, supra,* and declared: "The sweep of the Social Security Act is not to be interpreted by the variations and idiosyncrasies of local law." *Nizenkoff,* 135 Cal.Rptr. at 191. The court concluded that state interference would violate the Supremacy Clause of the United States Constitution.

Later, in 1980, after an unsettled period in California,[8] *In re Marriage of Cohen,* 164 Cal.Rptr. 672, 676, 105 Cal.App.3d 836 (1980), concluded that *Hisquierdo* was "current prevailing law" and "equally applicable to social security benefits." Social security was not subject to state court division.

*Umber v. Umber,* 591 P.2d 299 (Okla. 1979), citing *Flemming, Nizenkoff,* and *Hisquierdo,* ruled that statutory provision for a divorced spouse in the Social Security Act indicated that Congress intended to keep social security beyond state control. Interference was forbidden by the Supremacy ·Clause.

An appellate court in Illinois refused to interfere with the federal plan by dividing social security benefits. *In re Marriage of Evans,* 85 Ill.App.3d 260, 40 Ill.Dec. 713, 714, 406 N.E.2d 916, 917 (1980), *rev'd on other grounds,* 85 Ill.2d 523, 55 Ill.Dec. 529, 426 N.E.2d 854 (1981). A divorcing spouse's benefits could not be altered by divorce because the Social Security Act itself provided for spouses in event of divorce. This ruling was summarily affirmed by the Illinois Supreme Court. *In re Marriage of Evans,* 85 Ill.2d 523, 55 Ill.Dec. 529, 426 N.E.2d 854 (1981), *rev'd on other grounds.*

Later, in *In re Marriage of Hawkins,* 160 Ill.App.3d 71, 111 Ill.Dec. 897, 901, 513 N.E.2d 143, 147 (5 Dist.1987), the trial court had ordered Prentiss Hawkins to pay Arlene Hawkins $10,000 "because of a disparity in social security contributions and because of a contribution by [Arlene] of non-marital assets to the marital estate." The Illinois Appellate Court held that this was an impermissible attempt to divide federal benefits. The court rejected Arlene's argument that the award was merely "to remedy an inequity resulting from unequal contributions during the marriage by making a compensating payment to [her]." Citing *Evans,* 40 Ill.Dec. 713, 406 N.E.2d 916, the Illinois court ruled that the offset interfered with the federal scheme.

*Luna v. Luna,* 125 Ariz. 120, 608 P.2d 57 (App.1979), citing *Hisquierdo,* ruled that social security disability benefits being received by a divorced spouse were "his separate property and no offsetting award can be made...." *Id.,* 608 P.2d at 60.

In *Wisner v. Wisner,* 129 Ariz. 333, 631 P.2d 115, 117 (App.1981), Mary Wisner argued that because social security vests for the contributor after 10 years, but for a divorced spouse only after 20 years of marriage, social security should be treated as a simple pension plan with one half of the benefits to her since the contributions to it were paid by the marital community. Cit-

---

**8.** A resume of changes in California decisions about treatment of social security in marital dissolutions is enlightening. At first, in 1976, the California Court of Appeals, citing *Richardson v. Belcher,* 404 U.S. 78, 92 S.Ct. 254, held that social security benefits were federally controlled and outside the reach of state property laws. *In re Marriage of Nizenkoff,* 65 Cal.App.3d 136, 135 Cal.Rptr. 189 (1976). Following the California Supreme Court decision in *In re Marriage of Hisquierdo,* 19 Cal.3d 613, 139 Cal.Rptr. 590, 566 P.2d 224 (1977), California courts took a different stance: "We hold that ... Congress, in enacting the Social Security Act, did not intend to interfere with a state court's jurisdiction over distribution of marital property at dissolution of marriage." *In re Marriage of Hillerman,* 88 Cal.App.3d 372, 151 Cal.Rptr. 764, 770 (1979).

After the U.S. Supreme Court decision in *Hisquierdo,* the California courts returned to the position that social security benefits are beyond state divorce law: "The rationale supporting the federal *Hisquierdo* decision appears equally applicable to social security benefits such as those to which Philip may become entitled. We therefore conclude that Philip's social security benefits were not an asset of the community, were not subject to division, and cannot be recognized by any alternative provision employing a setoff; and that, as the trial court found, to do otherwise would be contrary to current prevailing law." *In re Marriage of Cohen,* 105 Cal. App.3d 836, 842–43, 164 Cal.Rptr. 672, 676 (1980).

ing *Hisquierdo,* the Arizona Court of Appeals ruled that benefits were the "sole and separate property of husband."

*Richard v. Richard,* 659 S.W.2d 746 (Tex.App.12 Dist.1983) reversed a trial court's award of one-half of the husband's disability benefit under social security to his divorced wife. During the marriage, the husband had converted his military disability payments to social security payments. The Texas court concluded that "Texas community property law is preempted by the Supremacy Clause of the United States Constitution" and ruled that "Social Security disability benefits are ... not subject to division under community property laws due to federal preemption." *Id.,* at 749.

Citing *McCarty* rather than *Hisquierdo,* an Idaho appellate court held in 1985 that Congress had exempted social security from state property division laws. "[T]he supremacy clause of the United States Constitution requires that the federal law be given effect over the state law." *Sherry v. Sherry,* 108 Idaho 645, 701 P.2d 265, 270 (App.1985).

The Oregon Supreme Court discussed the issue in depth in *Swan and Swan,* 301 Or. 167, 720 P.2d 747 (1986). The trial court used the value of both spouses' social security benefits in calculating the value of their property for division. Stanley Swan challenged this use of social security, but the Court of Appeals affirmed. The Oregon Supreme Court held it was error to consider the value of any social security benefits in making a marital property division. *Id.,* 720 P.2d at 749. The Oregon court cited 42 U.S.C. § 407 which prohibits assignments, § 659(a) which permits attachment of benefits for "alimony," and § 662(c) which expressly excludes property distributions from alimony. The court quoted *Hisquierdo* extensively and concluded:

"Because the antiassignment provisions of 45 U.S.C. § 231m are legally indistinguishable from the antiassignment provisions of 42 U.S.C. § 407(a), we have no hesitancy in concluding that the *His-*

*quierdo* rule applies here." *Swan,* 720 P.2d at 751.

The Oregon court also said that the specific benefits for divorced spouses evidenced Congressional intent to maintain exclusive federal control over social security. *Id.,* 720 P.2d at 752.

The Court of Appeals of North Carolina reversed a trial court order that a divorced husband share one-half in the wife's anticipated social security benefits. *Cruise v. Cruise,* 374 S.E.2d 882, 92 N.C.App. 586 (1989). The court declared the order for sharing "contradicts the Supreme Court's rationale in *Hisquierdo* which specifically prohibits the anticipation of benefits." 374 S.E.2d at 884.

Other decisions cited by Gerald are outdated, offering no contemporary support for his position. *See Locke v. Locke,* 246 N.W.2d 246 (Iowa 1976); *Zagajewski v. Zagajewski,* 161 Ind.App. 98, 314 N.E.2d 843 (1974); and *Cleaver v. Cleaver,* 10 Wash. App. 14, 516 P.2d 508 (1973). These decisions preceded *Hisquierdo* (1979) and *McCarty* (1981).

In some decisions, treatment of social security has not been clearly resolved. For example, James Daniels was receiving money from a private pension and from social security when he and Virginia divorced. The trial court awarded Virginia one-half of James's monthly income from the pension and social security, to be paid from the pension. On appeal, James contested the award of one-half of his pension to Virginia, but did not contest the consideration of his social security. The Court of Civil Appeals affirmed. *Daniels v. Daniels,* 490 S.W.2d 862 (Tex.Civ.App.1973).

*In re Marriage of Delgado,* 429 N.E.2d 1124 (Ind.App.1982), cited by Gerald, affirmed a trial court's decision not to divide the husband's social security and private pension, both of which he was already receiving, between the spouses. The only reference to social security was: "We note that the trial court labeled as vested both the retirement fund at Inland Steel and the Social Security benefits." 429 N.E.2d at 1127. The court went on to determine that the private pension was contingent and to

conclude that "contingent pensions are not marital property...." *Id.* The trial court's characterization of social security benefits was not discussed nor explained.

The Minnesota Court of Appeals decided a case remarkably similar to this one, involving a highway patrol pension and social security credits. *Crace v. Crace,* 396 N.W.2d 877 (Minn.App.1986). Without discussion, the Minnesota court ruled that the trial court did not abuse its discretion in not considering social security benefits. That ruling only avoided the issue; it offered no guidance for future trial court decisions.

The Oregon Court of Appeals permitted limited use of social security of both parties in computing spousal support. *Cave and Cave,* 85 Or.App. 336, 736 P.2d 215 (1987). This result is understandable since the Social Security Act exempts spousal support, other than a transfer of property, from the prohibition against using legal process on social security. 42 U.S.C. § 659(a) and 662(c).

In *Rudden v. Rudden,* 765 S.W.2d 719 (Mo.App.1989), the trial court awarded a divorced wife part of her husband's future firemen's retirement benefits. On appeal the husband claimed that the trial court should have " 'set off to [husband], if necessary, as additional marital property, the social security entitlements [wife] had acquired....' " The Missouri Court of Appeals rejected the argument, ruling that the trial "court permitted evidence of wife's potential social security benefits and there is no indication that the court failed to consider the matter." *Id.,* at 720.

To summarize: Before *Hisquierdo, supra,* a few decisions permitted limited use of social security benefits in marital property division. Following *Hisquierdo* and *McCarty,* state courts uniformly deny allocation of social security as marital property.

Although marital property is generally under state control, it is clear to us that Congress wants social security to be exclusively federally controlled. Congress preempted state divorce laws when it enacted its own scheme of social security benefits for divorced spouses. The anti-assignment and anti-legal-process provisions in the Social Security Act, with their specific allowance for spousal support, also promote federal uniformity and preempt state law.

We conclude that social security cannot be distributed or used as an offset in division of marital property. To do so would conflict with the federal plan and would violate the Supremacy Clause of the United States Constitution.[9] Any change in the allocation of social security at divorce must come from Congress. Therefore, we affirm the trial court's ruling that "[s]ocial security benefits of either party shall not be considered in this matter."

## HIGHWAY PATROL RETIREMENT

Alternatively, Gerald argued that his retirement fund should not have been treated as marital property because it was in lieu of social security. In effect, he argued that if Constance's social security could not be counted, his substitute should not.

■ Generally, unless there is some specific restriction in the plan, a pension or retirement fund accumulated during the marriage is marital property for allocation at divorce. *Opoien v. Opoien,* 425 N.W.2d 373 (N.D.1988). We summarized in *Delorey v. Delorey,* 357 N.W.2d 488, 491 (N.D. 1984):

> "This court has previously held that profit-sharing funds could be considered in the division of property. *See, e.g., Keig v. Keig,* 270 N.W.2d 558 (N.D.1978).... Finally, in *Bullock, supra,* at 910–11, we concluded that a non-vested military pension was properly considered an asset for purposes of property distribution and

**9.** United States Constitution, Article VI, clause 2: "This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

that the district court's formula properly allocated the risks and benefits involved between the parties."

Does the nature of Gerald's retirement fund make it inequitable to apply this general rule?

■ Gerald's retirement fund has no conditions or uncertainties, unlike Constance's anticipated benefits. The legislature has not reserved the right to alter, amend or repeal the fund retroactively, but rather has declared that, "[n]othing ... may reduce, modify, or enlarge any rights, privileges, or benefits" in effect before any amendment to the retirement fund chapter. NDCC 39–03.1–27(2). Nothing in the plan, Ch. 39–03.1, NDCC, limits assignability or transferability even if the retirement fund is not "subject to seizure upon execution or other process." NDCC 28–22–19.[10] Unlike

10. Until 1987, NDCC 39–03.1–23 provided:
> *"Exemptions from taxes and executions.* Any money received or to be paid as a retirement, optional retirement or disability retirement allowance, or severance allowance, or the right to any of these, shall be exempt from any state or municipal tax and from levy, sale, garnishment, attachment, or any other process whatsoever and shall be unassignable."

Ch. 386 of 1987 N.D. Sessions Laws repealed 39–03.1–23, as well as other specific statutory exemptions, and enacted a different provision, now NDCC 28–22–19:
> *"Exemptions from legal process—Public pensions, assistance, and awards.* The following amounts are exempt from liability for debts of the person to or on account of whom the amounts are paid, and are not subject to seizure upon execution or other process:
> "1. All pensions or annuities or retirement, disability, death, or other benefits paid or payable by, or amounts received as a return of contributions and interest from, a retirement system established pursuant to state law by the state, a state agency, a political subdivision of the state, or a firemen's relief association for retirement, annuity, pension, disability benefit, or death benefit purposes.
> "2. All awards made pursuant to chapter 65–13 as reparations for victims of crimes.
> "3. All payments of assistance as aid to dependent children pursuant to chapter 50–09."

Ch. 386 of 1987 N.D. Session Laws also repealed then subsection 3 of NDCC 28–22–03.1 on "exemptions from all attachment or process, levy and sale upon execution, and any other final process issued from any court...." Ch. 360 of 1987 N.D. Session Laws created a new subsection 3 in 28–22–03.1 as follows:
> "3. Pensions; annuity policies or plans; life insurance policies which, upon the death of the insured, would be payable to the spouse, children, or any relative of the insured dependent, or likely to be dependent, upon the insured for support and which have been in effect for a period of at least one year; individual retirement accounts; Keogh plans and simplified employee pension plans; and all other plans qualified under section 401 of the Internal Revenue Code [Pub.L. 83–591; 68A Stat. 134; 26 U.S.C. 401] and section 408 of the Internal Revenue Code [Pub.L. 93–406; 88 Stat. 959; 26 U.S.C. 408], and proceeds, surrender values, payments, and withdrawals from such pensions, policies, plans, and accounts, up to one hundred thousand dollars for each pension, policy, plan, and account with an aggregate limitation of two hundred thousand dollars for all pensions, policies, plans, and accounts. The dollar limit does not apply to the extent this property is reasonably necessary for the support of the resident and that resident's dependents, except that the pensions, policies, plans, and accounts or proceeds, surrender values, payments, and withdrawals are not exempt from enforcement of any order to pay spousal support or child support. As used in this subsection, 'reasonably necessary for the support' means required to meet present and future needs, as determined by the court after consideration of the resident's responsibilities and all the present and anticipated property and income of the resident, including that which is exempt."

In 1989, NDCC 28–22–19 was amended by section 2 of S.B. 2228, approved March 17, 1989, by the North Dakota Legislative Assembly, by inserting a reference in subsection 1 as follows: "except as provided by sections 3 and 4 of this Act." Section 3 added a new section to Ch. 39–03.1, as follows:
> *"Benefit payments to alternate payee under qualified domestic relations order.*
> "1. The board shall pay retirement benefits in accordance with the applicable requirements of any qualified domestic relations order. The board shall review a domestic relations order submitted to it to determine if the domestic relations order is qualified under this section and under rules established by the board for determining the qualified status of domestic relations orders and administering distributions under the qualified orders. Upon determination that a domestic relations order is qualified, the board shall notify the contributor and the named alternate payee of its receipt of the qualified domestic relations order.
> "2. A 'qualified domestic relations order' for purposes of this section means any judgment, decree, or order, including approval of a property settlement agreement, which relates to the provision of child support, spousal support, or marital property rights to a spouse, former spouse, child, or other dependent of a contributor, is made pursuant to a North Dakota*

Congressional direction for social security, the legislature did not completely shelter Gerald's retirement from allocation upon divorce.

Gerald will enjoy the full benefit of his retirement fund either when he retires or when he leaves the highway patrol. Having ten years of service, Gerald is entitled to a full refund of all credits to his account in the fund if he leaves the highway patrol before retirement at age 60. NDCC 39-03.1–10.1, 39–03.1–11(7), and 39–03.1–01(1). Under state law, his retirement fund is vested and available to him at any time.

■ Gerald's perceived disadvantage comes from a relatively recent change by Congress in the Social Security Act. Until 1983, Gerald might have accumulated his retirement fund during ten years or more of highway patrol work, and then also might have earned social security coverage during another ten years of insured work elsewhere.

But, Congress acted in 1983 to limit this kind of "double-dipping"—collecting both full social security benefits and another government pension accrued without contributing to social security coverage. 42 U.S.C. § 415(a)(7) and § 418, particularly subsection (l). Gerald's retirement fund was accumulated without contributing to social security. *See* footnote 1. Under federal law, this separate retirement accumulation precludes full participation in the general national retirement program. 42 U.S.C. 415(a)(7) and 415(f)(9).[11] Social security benefits, either in one's own right or as a spouse or divorced spouse of an insured individual, are reduced by a proportion of the amount of such other "in lieu" retirement benefits.[12]

Should Gerald's retirement benefits fall below a minimum, he would be eligible to receive social security benefits as a divorced husband. 42 U.S.C. § 402(c). But, as we understand this record, there is little likelihood that Gerald's pension from his

*domestic relations law, and which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a party of the benefits payable to the contributor. A qualified domestic relations order may not require the board to provide any type or form of benefit, or any option, not otherwise provided under the retirement system, or to provide increased benefits as determined on the basis of actuarial value. However, a qualified domestic relations order may require the payment of benefits at the early retirement date notwithstanding that the contributor has not terminated eligible employment. A qualified domestic relations order must specify:*

*"a. The name and the last known mailing address of the contributor and the name and mailing address of each alternate payee covered by the order;*

*"b. The amount or percentage of the contributor's benefits to be paid by the plan to each alternate payee;*

*"c. The number of payments or period to which the order applies; and*

*"d. Each retirement plan to which the order applies."*

NDCC 28–22–03.1(3) was similarly amended by S.B. 2228 to refer to the new section in Ch. 39–03.1.

11. "This windfall benefit is a direct result of the social security benefit formula, which does not distinguish well between workers with lifetime low earnings, and workers with less than a full career in covered work. . . .

"The formula works as intended for those who remain in covered employment throughout their careers. . . . However, the formula results in unintended windfalls in cases where the worker has low covered earnings because he has a career in noncovered work for which he receives a pension.

"These pensions, particularly Federal and State civil service pensions, are generally designed to *take the place both of social security and a private pension plan* for workers who remain in noncovered employment throughout their careers. Thus, a person eligible for such a pension will receive retirement income roughly equivalent to what social security and a private pension would give a worker with similar earnings under social security. . . .

". . . Therefore, your Committee's bill resolves the problem through changes in the benefit formula which will be applicable to workers who are eligible for a pension from noncovered employment." (Our emphasis). House Comm. on Ways and Means, Social Security Amendments of 1983, H.Rep. No. 98–25, 98th Cong., 1st Sess. 2, *reprinted in* 1983 U.S.Code Cong. & Admin.News 239–40.

12. 20 C.F.R. (4–1–88 Edition) § 404.407 and § 404.408a. Subsection (d)(1) of this latter regulation states:

"If you became eligible for a Government pension after June 1983, we will reduce (to zero, if necessary) your monthly Social Security benefits as a spouse by two-thirds the amount of your monthly pension."

retirement fund will be so small that he would qualify for some social security as Constance's divorced spouse.[13] Thus, Gerald's depressed social security opportunities stem from Congressional action, not state law. Correspondingly, if Gerald's retirement fund is not to be reckoned into the marital distribution, the direction must come from our state legislature.

Although Congress has limited his ability to collect both retirement benefits and social security benefits, Gerald's retirement fund has vested, cannot be changed, and has a present value. NDCC 39–03.1–11. Since it was earned during the marriage, it was equitable for the trial court to take it into account in dispersing marital property. In this case, it was all set aside to Gerald through an approximately equal division of allocable marital property. In another family situation, the retirement fund may be the principal asset of a marriage and a different division may be in order.

Therefore, we affirm the trial court's treatment of Gerald's highway patrol retirement fund as marital property as well as the distribution of the fund to him.

## CONCLUSION

We affirm the support and property decisions of the trial court.[14]

ERICKSTAD, C.J., and LEVINE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring in result.

Because of the context in which the issues were presented to the court I concur in the result reached by the majority opinion. I agree that Constance's Social Security benefits may not be divided as marital property nor may Gerald's Highway Patrol retirement benefits be offset by the value of Connie's Social Security benefits in arriving at the value of Gerald's pension.

Much of the case law upon which the majority opinion relies involves cases from community-property States in which the property is either considered community property to be *equally* divided between the parties or it is the property of the individual not subject to the community-property laws. In those instances I agree the Social Security benefits are not to be considered as community property.[1] But North Dakota is not a community-property State and we have consistently held that a division of property need only be equitable, not necessarily equal. E.g., *Williams v. Williams*, 302 N.W.2d 754 (N.D.1981). Therefore, we are not required to divide property in as rigid a formula as community-property States.

I do not, therefore, believe that Social Security retirement benefits must be entirely ignored in an *equitable* distribution of the property. The guidelines enumerated in *Ruff v. Ruff*, 78 N.D. 775, 52 N.W.2d 107 (1952), and *Fischer v. Fischer*, 139 N.W.2d 845 (N.D.1966), permit the court to consider such matters as the circumstances and necessities of each party, their financial circumstances, and such other matters as may be material. I do not conclude that the trial court must close its eyes to Social Security retirement benefits in making an equitable division of the property, nor do I

13. *See Hastings v. Heckler*, 728 F.2d 1049 (8th Cir.1984), where a divorced spouse's benefits were reduced to zero when offset by a monthly teacher's pension apparently earned through non-covered employment.

14. The concurring opinion makes apt observations about assessing the need for spousal support. However, the concurrence also says:
"I do not, ... believe that Social Security retirement benefits must be entirely ignored in an *equitable* distribution of the property." (Emphasis in concurrence).

But, Congress has expressly preempted all state laws as to "any community property settlement, equitable distribution of property, or other division of property between spouses or former spouses." 42 U.S.C. § 662(c), quoted ante, p. 7 of this opinion. In view of this express preemption, the statement in the concurrence is puzzling.

1. I also agree that our courts cannot direct the Social Security Administration to pay retirement benefits of one party to another or to otherwise directly offset those benefits against an otherwise equitable division of the property.

read the pertinent Federal statutes or prevailing case law as requiring that conclusion. Rather, I believe Social Security benefits may be considered as part of the entire financial condition of the party receiving the benefits although they may not be divided or used as a direct offset by the trial court. In many instances the consideration of the benefits would appear in the context of consideration of a need for spousal support by the Social Security recipient. Thus I do not read the majority opinion as establishing so rigid a rule that Social Security benefits must be entirely ignored in reaching an equitable division of property.

Finally, I add a word about the Highway Patrol Retirement. A study of the history of this Fund, and this writer was at one time a member of the North Dakota Highway Patrol Retirement Board (see Section 39–03.1–03, N.D.C.C., prior to its repeal in 1983), reveals that a decision was made to increase the contribution of the State and the members to that Fund rather than include the Highway Patrolmen within the Social Security System. This is indicated by the fact that in 1971 the Legislative Assembly amended Section 39–03A–27(1), N.D.C.C., now Section 39–03.1–27, to provide:

> "The legislative assembly in recognition of the value of good employer-employee relationships and the need to recruit and retain qualified highway patrolmen in this state, hereby declares its intent that the state should provide the comparable contribution for retirement of highway patrolmen's retirement system members as it provides for other state employees. *It is the further intent of the legislative assembly that because of the increase in state contributions to the North Dakota highway patrolmen's retirement system, the members of such system shall not obligate the state to additional payments for federal social security benefits to such members."* [Emphasis supplied.] 1971 N.D.Laws, Ch. 353, sec. 1.

Thus in 1971 a decision was made whereby the State would pay to the Highway Patrol Retirement Fund the same payroll percentage as it paid for other State employees to the other retirement funds *and* to Federal Social Security combined. The members of the Fund were thus treated comparably to other State employees but their benefits would all derive from the Fund and not from Social Security. Had the State divided its contributions between the Fund and Social Security, as it did for other State employees, both parties would be covered by Social Security, and presumably the trial court, following its rationale, would not have considered the potential benefits from Social Security of either party in dividing the marital assets. However, Gerald's equity in the Highway Patrol Retirement Fund would have been considerably less than the $40,137 value found by the trial court because the State would have been making reduced contributions to the Fund as a result of making simultaneous contributions to Social Security in Gerald's behalf. Whether or not the trial court, faced with a reduced value of Gerald's retirement fund, would have made a different equitable division of the assets of the parties may be speculative, but Gerald's Highway Patrol retirement was a considerable portion of the property awarded to Gerald by the trial court. To refuse to recognize the peculiar position of members of the Highway Patrol Retirement Fund vis a vis Social Security recipients might well create an inequity in some circumstances and trial courts should be cognizant of that possibility.