Hazel O. VITKO, Plaintiff, Appellee
and Cross–Appellant,

v.

George VITKO, Defendant, Appellant
and Cross–Appellee.

Civ. No. 940095.

Supreme Court of North Dakota.

Nov. 16, 1994.

Carol K. Larson, Pringle & Herigstad, PC, Minot, for plaintiff, appellee and cross-appellant. Appearance by Hazel O. Vitko.

Edward J. Bosch, Minot, for defendant, appellant and cross-appellee. Appearance by George Vitko.

VANDE WALLE, Chief Justice.

George Vitko appealed from a judgment of the district court, Northwest Judicial District, granting his wife, Hazel Vitko, a divorce. Hazel Vitko cross-appealed. Both parties challenge the distribution of the marital estate. We affirm.

George and Hazel Vitko were married in 1949. At the time of trial, George Vitko was 76 years old. Hazel was 67. Hazel is a retired registered nurse who, according to the trial court, ran the household and raised the couple's four children. George is a World War II veteran and construction worker and owns his own construction company.

The trial court found the earning capacities of the parties to be limited "to any income obtained from their property holdings; social security benefits; military disability benefits[;] and interest earned on accounts." The marital estate was valued at $583,070. Hazel was awarded property valued at $342,244. George received the remaining property, valued at $240,826. As part of the $342,244 awarded to Hazel the trial court included $50,000 in "spousal support" to be paid in two installments of $25,000 each.

George argues that much of his property was acquired with his military disability payments and, therefore, should not be included in the marital estate. He mis-

takenly relies on statutes which exempt certain benefits from attachment, lien, or judgment. *See* NDCC §§ 28–22–03; 28–22–03.1. Although the exemption statutes apply to divorce judgments in certain instances, *e.g., Seablom v. Seablom,* 348 N.W.2d 920 (N.D. 1984), George provides us with no cases or other law in which the distribution of marital property in a divorce is governed by the exemption statutes. In fact, the trial court is required to consider as part of the marital estate all of the real and personal property accumulated by the parties, regardless of its source. *Freed v. Freed,* 454 N.W.2d 516 (N.D.1990).[1]

It is true that military retirement pay that is waived to receive veterans' disability benefits is not marital property to be divided in equitable distributions. *Mansell v. Mansell,* 490 U.S. 581, 109 S.Ct. 2023, 104 L.Ed.2d 675 (1989); 10 U.S.C.A. § 1408 (West 1983 & Supp.1994). Some state courts have interpreted *Mansell* to preclude treating any veterans' disability benefits as property divisible upon divorce. *E.g., Wallace v. Fuller,* 832 S.W.2d 714 (Tex.Ct.App.1992); *but see Riley v. Riley,* 82 Md.App. 400, 571 A.2d 1261 (1990) [distinguishing *Mansell* because the disability payments at issue were not in lieu of retirement pay]. However, even those state courts which have recognized that *Mansell* precludes the division of veterans' disability benefits in property distributions have concluded "that when making property distributions or awarding alimony the trial court may consider military disability retirement pay as future income ... relevant to a determination of the parties' ultimate economic circumstances." *In re Marriage of Kraft,* 119 Wash.2d 438, 832 P.2d 871, 875

(1992); *see also Olson v. Olson,* 445 N.W.2d 1, 15 (N.D.1989) (VandeWalle, J., concurring) ["Thus I do not read the majority opinion as establishing so rigid a rule that Social Security benefits must be entirely ignored in reaching an equitable division of property."].

This narrow interpretation of the *Mansell* holding is entirely justified considering the standard the United States Supreme Court uses when reviewing the issue of whether Congressional actions preempt state domestic relations law. *Mansell, supra; Rose v. Rose,* 481 U.S. 619, 107 S.Ct. 2029, 95 L.Ed.2d 599 (1987); *Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). Even in *Mansell,* the Court expressed its reluctance to recognize federal preemption of state domestic relations law:

"Because domestic relations are preeminently matters of state law, we have consistently recognized that Congress, when it passes general legislation, rarely intends to displace state authority in this area.... Thus we have held that we will not find pre-emption absent evidence that it is "'positively required by direct enactment.'" ... The instant case, however, presents one of those rare instances where Congress has directly and specifically legislated in the area of domestic relations."

490 U.S. at 587, 109 S.Ct. at 2028 (citations omitted). Absent express language preempting state law in this area, the Supreme Court will not find implied preemption unless it is "positively required by direct enactment" or unless the absence of preemption does "'major damage' to 'clear and substantial' federal interests." *Hisquierdo v. Hisquierdo,* 439 U.S. at 581, 99 S.Ct. at 808. Thus, we need not give a broader preemptive effect to the

---

1. Even if we were to agree with George that disability benefits received during marriage are separable marital property, our decision today would not be affected. We are faced with a set of facts similar to that found in *Holmes v. Holmes,* 7 Va.App. 472, 375 S.E.2d 387 (1988). In that case, a Virginia court of appeals decided that, notwithstanding the husband's "bald assertions," it was "unnecessary to address ... arguments that certain exempt disability funds retain their exempt status after being deposited in accounts and that these funds need not be maintained separately and distinctly from marital funds because we conclude that the husband did not carry his burden in establishing that the

sources of his bank account funds were his disability pay." *Id.* 375 S.E.2d at 395. *See also In re Marriage of Hapaniewski,* 107 Ill.App.3d 848, 63 Ill.Dec. 535, 438 N.E.2d 466 (1982) [deciding that exempt property becomes marital property once the two are "commingled"].

However, most courts see the status of disability payments as the court did in *Rickman v. Rickman,* 124 Ariz. 507, 605 P.2d 909, 911 (Ct.App. 1980): "It is our opinion that the monthly checks received by appellant from the Veterans Administration for service-connected disabilities, *after dissolution of the marriage,* are his separate property." (Emphasis added).

*Mansell* holding than the *Mansell* court itself recognized in the "precise and limited" language of a particular federal statute.

The trial court expressly excluded George's disability benefits, as well as George's and Hazel's social security benefits, from the equitable property distribution. However, citing *Clauson v. Clauson*, 831 P.2d 1257 (Alaska 1992), it considered the disability income "so as to determine the financial circumstances of each party to the divorce."

■ Although labeled "spousal support," the $50,000 really has more of the indicia of a property settlement.[2] The trial court includes it in its valuation of Hazel's share of "a fair and equitable distribution of the property of this marriage." It is not clearly subject to modification at any time and the record does not reflect that Hazel's remarriage would relieve George of his requirement to pay. *See Redlin v. Redlin*, 436 N.W.2d 5, 8 (N.D.1989) [listing factors to be considered in deciding whether an amount to be paid by one spouse is part of a property division or is in the nature of spousal support].[3] *But see In re Marriage of Schara*, —— Mont. ——, 878 P.2d 908 (Mont.1994) [upholding a lump sum "maintenance" award and holding that it survived the recipient's remarriage]. Albeit forthcoming military disability payments are not marital property, it is clear that George possessed sufficient other property to warrant the trial court's distribution. *See, e.g., Jones v. Jones*, 7 Haw.App. 496, 780 P.2d 581 (1989) [deciding not to address the issue of whether husband could be required to pay for wife's Survivor Benefit Plan from his disability pay because husband had ample other resources from which to draw the payments].

■ Included in Hazel's award of property was a farm valued at $239,000. The court specifically considered that this property was inherited by Hazel within "the last five years of the 45 year marriage and it would not be equitable nor fair to view that property as equal marital property." The court noted that when excluding the value of the inherited farm, Hazel received $103,244 and George received $240,826 in property assets.

Hazel contends that because the farm constituted the greater part of her distribution, she received little of the marital assets acquired by the couple as a result of their marriage. Under the circumstances of this case, we find no error in the trial court's awarding the family residence to George. Therefore, we find no merit in Hazel's cross-appeal.

■ We treat a trial court's distribution of marital property as findings of fact subject to the "clearly erroneous" standard of review. Rule 52(a), N.D.R.Civ.P.; *Anderson v. Anderson*, 504 N.W.2d 569 (N.D.1993). Our review of the record and the court's findings reveals that the trial court's distribution of the Vitko marital property is not "clearly erroneous." Therefore, we affirm the judgment.

SANDSTROM and NEUMANN, JJ., and VERNON R. PEDERSON, Surrogate Judge, concur.

LEVINE, J., concurs with opinion.

---

2. It should be noted that the trial court lumped the "spousal support" payment into two payments partly because George's past actions had exhibited a recalcitrance in making regular support payments. The court may have been attempting to avoid recurring problems with the enforcement of the "spousal support" order. *C.f. Weigel v. Kraft*, 449 N.W.2d 583 (N.D.1989) [recognizing it was in the trial judge's discretion to order spousal support to be paid in a lump sum instead of monthly installments in lieu of payor's noncompliance with court order to document expenditures].

3. The trial court listed three reasons for awarding the "spousal support." It reasoned:
"First of all, she is a disadvantaged spouse in that she will no longer be able to reside within the family home that she has lived in for forty plus years. Secondly, she has been a disadvantaged spouse for years as a result of the unsubstantiated allegations made against her by the Defendant. Thirdly, the farm property that she was awarded was inherited property and has only been within the family for the last 5 years of the 45 year marriage and it would not be equitable nor fair to view that property as equal marital property."
Two of the three reasons listed, Hazel's not being able to reside in the family home and the timing of the inheritance, look more like equitable property distribution considerations than like spousal support concerns.

VERNON R. PEDERSON, Surrogate Judge, sitting in place of MESCHKE, J., disqualified.

LEVINE, Justice, concurring.

I concur in the majority opinion, but write specially to emphasize a lawyer's ethical duty to conduct himself temperately and to respect the rights of others to unbiased, fair treatment.

Mr. Vitko's attorney did not believe there was sufficient evidence to sustain the issuance of a pretrial, ex parte order awarding Ms. Vitko exclusive possession of the family home. In his closing argument to the trial court following a hearing on that interim order, Attorney Bosch told the court:

> "Throwing a man out of his house in my opinion is justifiable homicide in some cases."

This statement was uttered not in a bar or on a street corner, but in a court of law, by an attorney who is an officer of the court. It came at the end of a hearing which was riddled with inappropriate comments and behavior by Mr. Bosch, including racist epithets and obstreperous expressions of anger and disdain.

Rule 3.5 of the North Dakota Rules of Professional Conduct says that "A lawyer shall not ... [e]ngage in conduct intended to disrupt a tribunal." Disruptive conduct includes abusive or obstreperous conduct by an attorney. Comment to Rule 3.5.

Rule 4.4, NDRProfCond, prohibits a lawyer from using "means that have no substantial purpose other than to embarrass or burden a third person" in advocacy for a client. The comment to Rule 4.4 gives examples of prohibited conduct which include intentional degradation or harassment of others.

A violation of either Rule 3.5 or Rule 4.4 falls within the definition of professional misconduct under Rule 8.4, NDRProfCond. The underlying purpose of Rule 8.4 is to protect the public trust held by lawyers and to insure that licensed attorneys are competent and ethical in their service to the public. When an attorney engages in sexist or racist conduct, the public trust is violated and the attorney's ability to serve clients warrants careful consideration. *Matter of Swan*, 833 F.Supp. 794 (C.D.Cal.1993); *In re Plaza Hotel Corp.*, 111 B.R. 882 (Bkrtcy E.D.Cal. 1990); *Principe v. Assay Partners*, 154 Misc.2d 702, 586 N.Y.S.2d 182 (Sup.Ct.N.Y. 1992). Gender-bias and racism interfere with the administration of justice and impugn the integrity of the judiciary. *Id.*[1]

It is not only a lawyer who has a duty to avoid sexist or racist remarks. A judge, too, has a duty to "require lawyers in proceedings before the judge to refrain from manifesting, by words or conduct, bias or prejudice based upon race, [or] sex ... against parties, witnesses, counsel or others." Canon 3(B)(6), NDCJC. Although the boundaries of professional conduct allow wide latitude for lawyers to be advocates and to zealously promote their clients' cause, these boundaries do not countenance gender-biased or racist expression. A judge should be vigilant in maintaining the integrity of the judicial system by putting a stop to an attorney's misconduct in a manner that lets the attorney know the remarks or conduct, or both, will not be tolerated. The judge also has a duty to inform the Attorney Disciplinary Board of an attorney's violation of any Rules of Professional Conduct "that raises a substantial question as to the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects...." Canon 3(D)(2), NDCJC.

As the Preamble to our Rules of Professional Conduct makes clear, lawyers are the linchpin of our system of justice. They play "a vital role in the preservation of society." To fulfill that role, lawyers must understand "their relationship to our legal system." The

---

1. But one example of gender bias exhibited by Attorney Bosch during trial was his cross-examination of Ms. Vitko regarding the pregnancy of one of the Vitko daughters:

> "Q. [A]nd she was only 12 years old when she became pregnant?
> "A. She was raped.
> "Q. That's what they all say."

The court interceded:

> "Mr. Bosch, I can't let you testify. I can certainly let you question."

The court did not inform the attorney that his remark was outrageous or otherwise indicate its disapproval about the substance of the statement. *See* Canon 3(B)(6), NDCJC.

Rules of Professional Conduct "define that relationship" and demand of attorneys faithful compliance. There is no room in our courtrooms for sexism or racism and lawyers and judges should make clear their hostility to any such manifestations.